## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY, TRENTON DIVISION

| | |
|---|---|
| MICHAEL DOBKIN, individually and on behalf of all others similarly situated, | Case No. 3:15-cv-05089 |
| *Plaintiff*, | Hon. Brian R. Martinotti, USDJ |
| v. | Hon. Lois H. Goodman, USMJ |
| NRG RESIDENTIAL SOLAR SOLUTIONS LLC, a Delaware limited liability company, | |
| *Defendant*. | |

## PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF
## ATTORNEYS' FEES AND INCENTIVE AWARD

## TABLE OF CONTENTS

I.    INTRODUCTION .......................................................................... 1

II.   BACKGROUND ............................................................................ 2

    A.    The Underlying Claims and the TCPA ............................................ 3

    B.    The Litigation History and Work Performed for
    the Settlement Class's Benefit ............................................ 5

    C.    The Substantial Relief Secured for the Settlement
    Class ............................................................................... 8

III.  THE COURT SHOULD APPROVE THE REQUESTED
    ATTORNEYS' FEE AWARE BECAUSE IT IS
    REASONABLE .................................................................... 9

    A.    The Requested Fee is Reasonable Under the
    Percentage-of-Recovery Method ..................................... 11

        1.    *The size of the fund and number of persons
        benefitted renders a fair, reasonable and more
        than adequate result for the Settlement Class* ..................... 12

        2.    *The reaction of the Settlement Class to date
        has been overwhelmingly positive* ............................. 14

        3.    *Class Counsel handled this action in a skilled
        and efficient manner* ............................................... 15

        4.    *The litigation involved uncertain legal issues
        and lasted over two years in duration* ....................... 17

        5.    *The risk of non-payment* ........................................ 19

        6.    *Class Counsel devoted substantial time and
        resources to this case* ............................................. 20

7.  *An award of one third of the Settlement Fund fits squarely within the range to awards in similar cases* .........................................................21

8.  *Plaintiff's private contingent fee agreement with Class Counsel is for 33% of the Recovery* ...............................23

9.  *The Settlement's terms are strong, if not innovative* .................24

**B.  A Lodestar Crosscheck Confirms the Reasonableness of the Requested Fee** ...............................................24

**IV.  A $5,00 INCENTIVE AWARE TO PLAINTIFF IS REASONABLE AND SHOULD BE APPROVED** ..................................28

**V.  CONCLUSION** ..........................................................................29

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Campbell-Ewald Co. v. Gomez*,
  135 S. Ct. 2311 (2015) ...................................................................5

*Campbell-Ewald Co. v. Gomez*,
  136 S. Ct. 663 (2016) .....................................................................5

*Deposit Guaranty Nta'l Bank v. Roper*,
  445 U.S. 326 (1980)......................................................................19

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) ........................................................................9

*Mims v. Arrow Fin. Svcs's, LLC*,
  132 S. Ct. 740 (2012) ......................................................................4

*Spokeo, Inc. v. Robins*,
  -- S. Ct. -- , 2018 WL 491554 (Mem.) (Jan. 22, 2018) ................18

*Spokeo, Inc. v. Robins*,
  136 U.S. 1540 (2016) ......................................................................6

**United States Circuit Court of Appeals Cases**

*Assessment Techs. of WI, LLC v. WIREdata, Inc.*,
  361 F.3d 434 (7th Cir. 2004).........................................................23

*Gager v. Dell Fin. Serv., LLC*,
  727 F.3d 265 (3d Cir. 2013)............................................................4

*Gunter v. Ridgewood Energy Corp.*,
  223 F.3d 190 (3d Cir. 2000)...............................10, 11, 12, 13, 19

*In re AT&T Corp.*,
  455 F.3d 160 (3d Cir. 2006)............................9, 10, 20, 22, 24, 25

*In re Cendant Corp. PRIDES Litig.*,
  243 F.3d 722 (3d Cir. 2001) ................................................................. 19, 27

*In re Diet Drugs Prod. Liab. Litig.*,
  582 F.3d 524 (3d Cir. 2009) ................................................................. 11

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods.*
    *Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ................................................................. 12, 21

*In re Prudential Ins.Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3rd Cir. 1998) ........................................................ 9, 10, 12, 27

*In re Rite Aid Corp. Sec. Litig.*,
  396 F.3d 294 (3d Cir. 2005) ................................................... 11, 12, 21, 25, 26

*Landsman & Funk, P.C. v. Skinder-Strauss Associates.*
  No. 15-cv-02485, 2016 WL 611441 (3d Cir. Feb. 16, 2016) ...................... 22

*Satterfield v. Simon & Schuster, Inc.*,
  569 F.3d 946 (9th Cir. 2009) ................................................................. 16

*Sullivan v. DB Investments, Inc.*,
  667 F.3d 273 (3d Cir. 2011) ................................................................. 9

*Thomas v. Taco Bell Corp.*,
  582 F. App'x 678 (9th Cir. 2014) ........................................................... 18

**United States District Court Cases**

*Arthur v. Sallie Mae, Inc.*,
  No. 10-cv-00198, Dkt. 266 (W.D. Wash. Sept. 17, 2012) ........................... 14

*Birchmeier v. Caribbean Cruise Line, Inc., et al.*,
  No. 12-cv-04069 (N.D. Ill.) ................................................................. 15

*Bridgeview Health Care Ctr., Ltd. v. Jerryclark*,
  No. 09-cv-05601, 2015 WL 4498741
  (N.D. Ill. July 23, 2015) ................................................................. 22

*Demmick v. Cellco P'ship*,
    No. 06-cv-02163, 2015 WL 13643682
    (D.N.J. May 1, 2015) ....................................................................................27

*Hageman v. AT & T Mobility LLC*,
    No. 13-cv-50-BLG-RWA, 2015 WL 9855925
    (D. Mont. Feb. 11, 2015) ............................................................................22

*Harris v. comScore, Inc.*,
    292 F.R.D. 579, 581 (N.D. Ill. 2013) .........................................................15

*Hashw v. Dept. Stores Nat'l Bank*,
    182 F. Supp. 3d 935, 947 (D. Minn. 2016) .................................................13

*Henderson v. United Student Aid Funds, Inc.*,
    No. 13-cv-01845, 2017 WL 766548
    (S.D. Cal. Feb. 28, 2017) 18

*In re AremisSoft Corp. Sec. Litig.*,
    210 F.R.D. 109 (D.N.J. 2002) ...............................................................22, 27

*In re Capital One Tel. Consumer Prot. Act Litig.*,
    80 F. Supp. 3d 781 (N.D. Ill. 2015) .......................................................13, 19

*In re Computron Software, Inc.*,
    6 F. Supp. 2d 313 (D.N.J. 1998) .................................................................16

*In re Ins. Brokerage Antitrust Litig.*,
    297 F.R.D. 136 (D.N.J. 2013) ...............................................14, 23, 24, 26

*In re Jiffy Lube Int'l, Inc. Text Spam Litig.*,
    No. 11-md-02261, Dkt. 97 (S.D. Cal. Feb. 20, 2013)..................................14

*In re Linerboard Antitrust Litig.*,
    2004 WL 1221350 (E.D. Pa. June 2, 2004) ................................................29

*In re Netflix Privacy Litig.*,
    No. 11-cv-0379 (N.D. Cal. Aug. 12, 2011) ................................................15

*In re Safety Components, Inc. Sec. Litig.*,
    166 F. Supp. 2d 72 (D.N.J. 2001) ..........................................................22, 23

*In re Schering-Plough Corp. Enhance Sec. Litig.*,
    No. 08-cv-02177, 2013 WL 5505744
    (D.N.J. Oct. 1, 2013) ....................................................................................26

*Kazemi v. Payless Shoesource, Inc.*,
    No. 09-cv-05142, Dkt. 94 (N.D. Cal. Apr. 2, 2012) .....................................13

*Kolinek v. Walgreen Co.*,
    311 F.R.D. 483 (N.D. Ill. 2015) .............................................................13, 22

*Kristensen v. Credit Payment Servs. Inc.*,
    No. 12-cv-00528, 2015 WL 4477425
    (D. Nev. July 20, 2015) .................................................................................18

*Lees v. Anthem Ins. Companies Inc.*,
    No. 13-cv-01411, 2015 WL 3645208
    (E.D. Mo. June 10, 2015) ..............................................................................22

*Milliron v. T-Mobile USA, Inc.*,
    No. 08-cv-04149, 2009 WL 3345762 (D.N.J. Sept. 10, 2009),
    *as amended* (Sept. 14, 2009), *aff'd*, 423 F. App'x 131
    (3d Cir. 2011) .........................................................................................17, 25

*Mirakay v. Dakota Growers Pasta Co.*,
    No. 13-cv-04429, 2014 WL 5358987 (D.N.J. Oct. 20, 2014) .......................25

*Rowe v. E.I. Dupont de Nemours & Co.*,
    2011 WL 3837106 (D.N.J. Aug. 26, 2011)............................................12, 21

*Saf--T--Gard Int'l, Inc. v. Seiko Corp. of Am.*,
    No. 09-cv-00776 (N.D. Ill. Jan. 14, 2011) ....................................................22

*Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*,
    No. 13-cv-00489, 2015 WL 9413143
    (W.D. Ky. Dec. 22, 2015) .............................................................................22

*Sullivan v. DB Investments, Inc.*,
    No. 04-cv-02819, 2008 WL 8747721 (D.N.J. May 22, 2008) ..................... 28

*Vandervort v. Balboa Capital Corp.*,
    8 F. Supp. 3d 1200 (C.D. Cal. 2014) ......................................................... 22

*Varacallo v. Massachusetts Mut. Life Ins. Co.*,
    226 F.R.D. 207 (D.N.J. 2005) .................................................................... 29

*Wilens v. NRG Energy, Inc., et al.*,
    No. 15-cv-01128 (C.D. Cal.) ...................................................................... 21

**Illinois State Appellate Courts**

*Ryan v. City of Chicago*,
    274 Ill. App. 3d 913 (1st Dist. 1995) ......................................................... 10

**Statutory Provisions**

47 U.S.C. § 227 ................................................................................................ *passim*

Fed. R. Civ. P. 23 ............................................................................................ *passim*

**Other Authorities**

3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions*
    § 14. 03 (3d ed. 1992) ................................................................................ 10

*In the Matter of the Joint Petition Filed by Dish Network, LLC et
    al. for Declaratory Ruling Concerning the Tel. Consumer
    Prot. Act (TCPA) Rules*, Declaratory Ruling, 28 FCC Rcd.
    6574 (F.C.C. May 9, 2013) ........................................................................... 5

Manual for Complex Litigation, § 24.121 ......................................................... 10

Third Circuit Task Force, *Selection of Class Counsel*, 105
    (2002) .................................................................................................. 10, 25

## I.    INTRODUCTION

Plaintiff Michael Dobkin ("Dobkin" or "Plaintiff") brought this case alleging that NRG Energy, Inc. ("NRG Energy") and NRG Residential Solar Solutions LLC ("NRG Residential") violated the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, by placing, or causing to be placed, unsolicited autodialed and/or prerecorded calls to consumers' telephones regarding the sale or leasing of residential solar panel systems. After more than two years of active litigation, which included motion practice, written and oral discovery, and many months of arms'-length negotiations presided over by Magistrate Judge Goodman, Class Counsel secured for the benefit of the Class a Settlement[1] that is vastly superior to the majority settlements on the now raked-over TCPA landscape. It's that Settlement which forms the basis for Plaintiff's request for attorneys' fees, expenses, and an incentive award.

The Settlement—which this Court preliminarily approved by its Order entered November 17, 2017—is undoubtedly fair, reasonable and adequate under the law. As explained herein, and will be explained further in Plaintiff's upcoming motion for final approval, the Settlement fairly compensates the Class on account of their claims and is the product of arms' length negotiations overseen by

---

[1]     A copy of the class action settlement agreement (the "Settlement" or "Settlement Agreement") is attached as Exhibit 1. Except as otherwise noted, capitalized terms take the meaning given them in the Settlement.

Magistrate Judge Goodman. And, the Class's reaction to the Settlement has also been extremely positive; based on the current rates of claims, the *pro rata* individual distribution currently stands at more than $200.

In light of this substantial relief and the efforts that led to it as a backdrop, Plaintiff respectfully requests that this Court approve: (1) a fee award to Class Counsel in the amount of $2,333,333, equal to one-third of the Settlement Fund; and (2) a $5,000 incentive award to Plaintiff for his service as class representative. Given the time and effort Class Counsel put into the case, the unique skill and expertise they brought to bear, and the risks they faced in prosecuting a complex and uncertain case for over two years, the fees requested are entirely reasonable under the factors used by courts in the Third Circuit to determine whether a percentage of the common fund is a reasonable award when "cross-checked" against Class Counsel's lodestar. Similarly, in light of Plaintiff's contributions and unwavering commitment to the litigation of this case, his request for a $5,000 incentive award is reasonable and merits this Court's approval as well.

## II.    BACKGROUND

A brief summary of the underlying facts and law demonstrates the reasonableness of the requested fees, costs, and incentive awards.

A.     The Underlying Claims and the TCPA.

In or around 2014, consumers throughout the country began receiving phone calls promoting the sale or lease of residential solar panel systems. The calls, which were made by third parties (not by NRG Residential), claimed allegiance with fictional or unrelated nonprofit and governmental entities, such as the "Department of Solar Energy" and the "Clean Planet Program" (Dkt. 28 ¶¶ 22, 23.) The companies placing the calls often disabled or obscured certain menu prompts to make it more difficult for consumers to opt out of receiving more calls in the future. Recipients of the calls regularly complained online about receiving the calls and having to deal with the ineffective opt-out mechanisms. (*Id.* ¶¶ 15, 16.)

Plaintiff Michael Dobkin initiated this case on July 1, 2015, against NRG Energy,  and its wholly-owned subsidiary, Defendant NRG Residential.[2] (Dkt. 1.) The lawsuit alleges that NRG Residential either placed or caused to be placed these telemarketing calls to consumers throughout the country without their permission or consent, including to consumers that have registered their phone numbers with the National Do Not Call Registry. (Dkt. 28 ¶ 1.)

---

[2]     After NRG Energy and NRG Residential filed a joint Motion to Dismiss, Plaintiff filed his First Amended Complaint. (*See* Dkt. 11 ("Motion to Dismiss"), Dkt. 16 ("First Amended Compl.")). On September 25, 2015, Plaintiff dismissed his claims in this matter against NRG Energy, without prejudice, and filed a Second Amended Complaint against NRG Residential. (*See* Dkt. 25 ("Notice of Voluntary Dismissal"), Dkt. 28 ("Second Amended Compl."))

Plaintiff further claimed that the calls he received constituted the exact conduct that the TCPA was enacted to stop. (Dkt. 28 ¶¶ 3, 4, 17.) That is, Congress passed the TCPA in response to "voluminous consumer complaints," and to restrict telemarketing calls and prohibit "intrusive nuisance calls" it determined were an invasion of privacy. *Mims v. Arrow Fin. Svcs's, LLC*, 132 S. Ct. 740, 744 (2012); *see also Gager v. Dell Fin. Serv., LLC*, 727 F.3d 265, 268 (3d Cir. 2013) (same). As such, the TCPA is a means to combat the growing threat to privacy posed by automated telemarketing, such as those at issue in this case, and makes it unlawful, subject to certain exceptions, for any person within the United States to:

(A)   make any call (other than a call made for emergency purposes or made with prior express consent of the called party) using any automatic telephone dialing system [("ATDS")] or an artificial or prerecorded voice . . . (iii) to any telephone number assigned to a . . . cellular telephone . . . or

(B)   initiate any telephone call to any residential telephone line using an artificial or prerecorded voice . . . without the prior express consent of the called party . . .

47 U.S.C. § 227(b)(1)(A)(iii), 47 U.S.C. § 227(b)(1)(B).

The purpose of the law is clear: to protect consumers from unwanted telemarketing. Accordingly, the FCC has made clear that liability under the TCPA will attach to persons or entities who have a high degree of involvement in the transmissions even if they did not place the calls, and that an entity may be liable under the TCPA through federal common law agency principles even where that

entity did not place the calls at issue. *See In the Matter of the Joint Petition Filed by Dish Network, LLC et al. for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, Declaratory Ruling, 28 FCC Rcd. 6574, 6583-84, 6587, n. 107 (F.C.C. May 9, 2013); *cf. Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) (finding "no cause to question" the FCC's ruling "that under federal common-law principles of agency, there is vicarious liability for TCPA violations").

**B.      The Litigation History and Work Performed for the Settlement Class's Benefit.**

This action has involved over two years of active litigation, beginning in 2015 when Plaintiff initially filed suit against both NRG Energy and NRG Residential after receiving multiple telemarking calls regarding the lease or sale of residential solar panel systems. Plaintiff also filed a precautionary motion for class certification[3] but requested that the Court reserve ruling on it until after class discovery concluded.

---

[3]      At the outset of this litigation, the Supreme Court had certified, but not yet heard argument over the issue of whether defendants can moot the class action and plaintiff's representative claims by tendering the full amount of individual damages before a class certification motion is filed. *See Campbell-Ewald Co. v. Gomez*, 135 S. Ct. 2311 (2015). In light of this uncertain law, Plaintiff moved to certify the class at the same time he filed his complaint to preserve his and the putative class's rights. On January 20, 2016, the Supreme Court's decision in *Campbell-Ewald* settled the issue by clarifying that an involuntary settlement offer does not moot a plaintiff's representative claims. *Campbell-Ewald*, 136 S. Ct. at 663.

From the outset of this case, Defendants have vigorously disputed Plaintiff's claims. Defendants first moved to dismiss the initial complaint, contending that Plaintiff's complaint improperly grouped NRG Residential and NRG Energy as defendants and that Plaintiff lacked Article III standing to sue. (Dkt. 11.) Plaintiff filed an amended complaint to ameliorate the former issue, which NRG Residential answered. (Dkts. 16, 26.)

After answering the amended complaint, NRG Residential moved to stay the case pending the Supreme Court's decisions on Article III standing in *Spokeo, Inc. v. Robins*, 136 U.S. 1540 (2016) and mootness in *Campbell-Ewald*. (Dkt. 32.) Despite Plaintiff's opposition to the stay, the Court granted NRG Residential's request and the parties waited for several months for decisions from the Supreme Court. Once those cases were decided and it was clear this case would proceed, the stay was lifted, the parties filed a Joint Proposed Discovery Plan, exchanged initial disclosures, and served written discovery on each other and certain third parties. (Dkts. 42, 43; *See also* Declaration of Rafey S. Balabanian ("Balabanian Decl."), attached hereto as Exhibit 2, ¶ 8.)

Discovery into the source of the calls was extensive and required Class Counsel to serve dozens of subpoenas on various telephone companies and the third-party lead generators that allegedly made the calls on which Dobkin bases his suit. (*Id.* ¶ 9.) In efforts to enforce those subpoenas, Class Counsel spent dozens of

hours conferring with various third-party individuals and entities—some of whom were located outside of the United States—and on at least two occasions, were required to open miscellaneous actions to obtain the information sought. (*Id.*) Discovery ultimately revealed that NRG Residential purchased leads from third-party lead generators as a result of lead generators' telephone calls to consumers. (*Id.* ¶ 10.) NRG Residential would then be provided with the contact information of those consumers to whom it hoped to sell its solar energy products. (*Id.*) In the end, the parties exchanged extensive discovery in the case, and it permitted both sides to evaluate the validity of their respective claims and defenses. (*Id.*)

Still, the parties held very different views on the strengths and weaknesses of the case; Plaintiff remained confident that he would ultimately prevail in litigation, while NRG Residential denied that the calls at issue violate any law or that it is liable for calls made by third parties. (*Id.* ¶ 11.) Nonetheless, at the same time they were actively litigating the case, the parties agreed to engage in settlement discussions, which would ultimately continue for the better part of a year. (*Id.* ¶ 12.) Specifically, on September 27, 2016, the parties attempted to resolve the suit through a private mediation with Professor Eric Green of Resolutions LLC. (*Id.*) That mediation was not successful in bringing about a settlement. (*Id.*) The parties then returned full steam to discovery, but ultimately decided to revisit settlement

talks in March 2017, this time with the assistance of Magistrate Judge Goodman. (*Id.* ¶ 13.)

After several exchanges of settlement communications and months of telephonic conferences, the parties attended an in-person settlement conference with Magistrate Judge Goodman on July 12, 2017. (*Id.* ¶ 14.) Despite the wide gap in the parties' settlement positions, Magistrate Judge Goodman worked tirelessly to bring them closer together on the material terms of a class settlement. (*Id.* ¶ 15.) Magistrate Judge Goodman eventually made a mediator's proposal, which both parties accepted. (*Id.*) After additional negotiations over specifics, the parties executed the formal Settlement Agreement now before the Court. (*Id.* ¶ 16.)

### C.   The Substantial Relief Secured for the Settlement Class.

The Settlement Agreement creates a non-reversionary $7 million fund (the "Settlement Fund"), which will be allocated on a *pro rata* basis to class members who file approved claims.[4] Based on the current number of claims, Class Counsel anticipates that each class member who submits a valid claim will receive more than $200. (Balabanian Decl. ¶ 17.) As set forth in the Settlement Agreement, NRG has also agreed to pay Plaintiff an incentive award and Class Counsel

---

[4] The Settlement defines the class as all persons with respect to whom NRG Residential was offered a lead from a third-party lead generator as a result of the lead generator's telephone call to such person. (Settlement Agreement § 1.28.) (the "Settlement Class".) Based on discovery and investigation to date, there are approximately 317,000 individuals the Settlement Class. (*Id.*)

reasonable attorneys' fees and reimbursable expenses, in amounts set by the Settlement Agreement and as approved by the Court, to be paid from the Settlement Fund. (Settlement Agreement §§ 9.1, 9.2, 9.3.)

In addition, the Settlement Agreement states that NRG Residential represents that it is no longer operating a business pursuant to which it purchases leads from a third-party lead generator as a result of that lead generator's telephone calls to such persons. (*Id.* § 2.2.) In light of this relief, the requested fees should be approved.

## II.   THE COURT SHOULD APPROVE THE REQUESTED ATTORNEYS' FEE AWARD BECAUSE IT IS REASONABLE.

The standard for evaluating fees is reasonableness. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Courts in the Third Circuit apply the percentage-of-recovery or lodestar method to determine the reasonableness of an attorneys' fee request. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 330 (3d Cir. 2011) (en banc). "The percentage-of-recovery method applies a certain percentage to the settlement fund," while "[t]he lodestar method multiplies the number of hours class counsel worked on a case by a reasonable hourly billing rate for such services." *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006). However, the percentage-of-recovery method has long been preferred in this Circuit in common-fund cases like this one. *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333-334 (3rd Cir. 1998) ("The percentage-of-recovery method is

generally favored in cases involving a common fund, and is designed to allow courts to award fees from the fund in a manner that rewards counsel for success and penalizes it for failure") (internal quotations and citations omitted); *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 198 (3d Cir. 2000).[5] Nevertheless, the Third Circuit has "recommended that district courts use the lodestar method to cross-check the reasonableness of a percentage-of-recovery fee award" while at the same time not displacing its primary reliance on the percentage method. *In re AT&T Corp.*, 455 F.3d at 164.

Here, application of the percentage-of-recovery method and a lodestar cross check demonstrate that Plaintiff's requested fee award amounting to one-third of the Settlement Fund ($2,333,333.33) is eminently reasonable and may appropriately be approved.

---

[5]      To be sure, courts have noted that "one purpose of the percentage method" of awarding fees—rather than the lodestar method, which arguably incentivizes drumming up billable hours — "is to encourage early settlements by not penalizing efficient counsel." *Gunter*, 223 F.3d at 198 (citing Manual for Complex Litigation, § 24.121, at 207, citing 3 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 14.03, at 14-3 to 14-7 (3d ed. 1992)). The lodestar method, on the other hand, has been roundly criticized for "increas[ing] the workload of an already overtaxed judicial system . . . creat[ing] a sense of mathematical precision that is unwarranted in terms of the realities of the practice of law, . . . le[ading] to abuses such as lawyers billing excessive hours, . . . not provid[ing] the trial court with enough flexibility to reward or deter lawyers so that desirable objectives will be fostered." *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 923 (1st Dist. 1995) (summarizing findings of the Third Circuit task force appointed to compare the respective merits of the percentage-of-the-recovery and lodestar methods).

**A.    The Requested Fee is Reasonable Under the Percentage-of-Recovery Method.**

The Third Circuit has identified a number of factors to aid district courts in evaluating the reasonableness of percentage fee awards. *See Gunter*, 223 F.3d at 195 n. 1. These seven well-known factors, commonly called the *Gunter* factors, include: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301 (3d Cir. 2005) (*citing Gunter*, 223 F.3d at 195 n. 1).[6] The Third Circuit has also, at times, considered three other factors—i.e. (8) the value of the benefits attributable to other groups such as government agencies conducting investigations; (9) the percentage that would have been negotiated in a private contingent fee agreement; and (10) any innovative terms of the settlement. *See In re Diet Drugs Prod. Liab. Litig.*, 582 F.3d 524, 541 (3d Cir. 2009). These factors "need not be applied in a formulaic way…[and] in certain cases, one factor may outweigh the rest." *Id.* at 545.

---

[6]    Because the eighth factor is subsumed into consideration of the sixth *Gunter* factor (*see infra*, Section II.A.6.) it is not separately discussed here.

As explained below, each of these factors supports granting the requested attorneys' fees.

 1. *The size of the fund and number of persons benefitted renders a fair, reasonable and more than adequate result for the Settlement Class.*

The first *Gunter* factor examines the size of the fund and the number of persons benefitted. *See Gunter*, 223 F.3d at 195. n .1.[7] Here, the Settlement creates a $7 million for a Settlement Class of approximately 317,000 individuals. Based on the current rates of claims, the *pro rata* individual distribution currently stands at more than $200. (Balabanian Decl. ¶ 17.)[8] This expected recovery is entirely appropriate when compared to the actual damages suffered by individual class

---

[7]     The size of the fund is relevant to the reasonableness of the fee award because, generally speaking, there is an inverse relationship between an increase in the size of the settlement fund and the percentage fee award. *In re Prudential*, 148 F.3d at 339. As discussed below, in class action settlements in the Third Circuit fees typically range between 30% and 43% of the common fund. *See In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 822 (3d Cir. 1995). That percentage decreases only as the settlement fund increases. Thus, in addition to the other factors discussed herein, the $7 million non-reversionary common fund secured under the Settlement here places this case squarely in the typical 30% to 43% range for attorneys' fees. *See, e.g.*, *In re Rite Aid Corp.*, 396 F.3d at 306–07 (review of 289 settlements demonstrates "average attorney's fees percentage [of] 31.71%" with a median value that "turns out to be one-third"); *Rowe v. E.I. Dupont de Nemours & Co.*, 2011 WL 3837106, at *22 (D.N.J. Aug. 26, 2011) (finding award of 33.33% to be reasonable of $8.3 million settlement fund).

[8]     The validity of the claims submitted have not yet been determined. Thus, if certain claims are found to be invalid the individual amount paid for valid claims will increase.

members and similar TCPA settlements. *See Gunter,* 223 F.3d at 199 (explaining that, "[i]n assessing "size of the settlement" factor and whether the settlement was favorable to the plaintiffs and class members, the District Court may want to also determine what percentage of the plaintiffs' and class members' approximated actual damages the settlement figure represents" in addition to "awards in similar cases").

Here, given the nature of the claim—the receipt of unsolicited and unconsented to phone calls—the actual damages suffered by class members is minimal, which makes the recovery all the more reasonable. And, as against the statutory damages recoverable—$500 (or $1,500 if trebled)—the individual relief is still quite significant—almost half the statutory amount[9]—particularly compared to many other TCPA settlements. *See, e.g., In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (providing $34.60 to each claiming class member); *Hashw v. Dept. Stores Nat'l Bank*, 182 F. Supp. 3d 935, 944 (D. Minn. 2016) (approving settlement providing claiming class members in TCPA case a $33.20 payment); *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 493 (N.D. Ill. 2015) (providing a roughly $30 payment for each claiming class member); *Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-05142, Dkt. 94 (N.D.

---

[9]     The discovery obtained and Class Counsel's investigation led to the conclusion that treble damages would have been nearly impossible to recover in this case. (Balabanian Decl. ¶ 19.)

Cal. Apr. 2, 2012) (granting approval of a settlement that provided a $25 voucher to each claiming class member); *In re Jiffy Lube Int'l, Inc. Text Spam Litig.*, No. 11-md-02261, Dkt. 97 (S.D. Cal. Feb. 20, 2013) (granting approval of a settlement that provided a $20 voucher or $15 cash to each claiming class member); *Arthur v. Sallie Mae, Inc.*, No. 10-cv-00198, Dkt. 266 (W.D. Wash. Sept. 17, 2012) (granting approval of a settlement that provided $20-40 cash payment to each claiming class member). In short, the Settlement provides compensation to class members far in excess of that provided by the settlements in similar TCPA cases, which weighs in favor of approving the requested attorneys' fees.

2. *The reaction of the Settlement Class to date has been overwhelmingly positive.*

Next, "[t]he absence of substantial objections by Settlement Class members to the fees requested by Class Counsel strongly supports approval." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 154 (D.N.J. 2013). Here, the deadline for class members to object, exclude themselves, or file claims has not yet occurred, but the reaction to date has been utterly positive. (Balabanian Decl. ¶ 18.) There are currently zero objections or opt-outs, and approximately 22,373 class members (7%) – a significant number in the context of consumer class actions generally and TCPA cases more specifically – have already submitted claims. (*Id*.) Class Counsel will update these numbers in their final approval briefing and at the

Final Approval Hearing, but as it stands, this factor strongly supports the requested fee.

> 3.     *Class Counsel handled this action in a skilled and efficient manner.*

With regards to the next factor, the manner in which Class Counsel conducted all aspects of this litigation, including throughout settlement negotiations, exemplifies their significant skill and expertise. Class Counsel are experienced litigators and well-respected members of the legal community, are well versed in litigating similar TCPA class actions, and have effectively litigated this case. (*See* Edelson Firm Resume, attached to the Balabanian Decl. as Exhibit 2-A.) [10] Still, the path to resolution in this case was neither quick nor easy. As

---

[10]      Edelson PC has been recognized as a pioneer in consumer technology class actions and has been named a "top national plaintiff's class action firm" in the areas of "technology, privacy, and telecommunications" by the U.S. Chamber Institute for Legal Reform.[10] (Balabanian Decl., Ex. 2-A.) The firm is an unparalleled leader in large digital privacy cases involving complicated technological issues, and Class Counsel have frequently been appointed lead class counsel by courts throughout the country. *See In re Netflix Privacy Litig.*, No. 11-cv-00379 (N.D. Cal. Aug. 12, 2011) (appointing Edelson PC lead counsel, noting that while two other firms had impressive resumes and litigation experience, Edelson PC's "significant and particularly specialized expertise in electronic privacy litigation and class action renders them superior to represent the putative class"); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 581 (N.D. Ill. 2013) (appointing Edelson PC Class Counsel in case achieving adversarial certification in what is believed to be the largest ever privacy class action). Particularly relevant here, Class Counsel is responsible for the largest TCPA class action settlement to date, *Birchmeier v. Caribbean Cruise Line, Inc., et al.*, No. 12-cv-04069 (N.D. Ill.) (co-lead counsel in TCPA class action that settled for up to $76 million in cash relief),

---

discussed above, this case has over two years of hard-fought litigation from both sides, and from its outset (and the wide gap in the parties' initial settlement positions), the parties held very different views when it came to the merits and the issue of certification. (Balabanian Decl. ¶ 11.) However, drawing on their experience, and the extensive information obtained through the litigation—and with the invaluable assistance of this Court's Magistrate Judge Goodman—Class Counsel were able to negotiate a good deal for the Settlement Class, one that is certainly fair, reasonable and adequate. (*Id.* at ¶ 16.)

Indeed, the relief that Class Counsel obtained for the Settlement Class, while not over-using the Court's limited resources, would have been difficult to achieve without Class Counsel's particularized experience and ability. *See In re Computron Software, Inc.*, 6 F. Supp. 2d 313, 323 (D.N.J. 1998) ("The most significant factor in this case is the quality of representation, as measured by the quality of results achieved, the difficulties faced, the speed and efficiency of the recovery, the standing, experience and expertise of counsel, the skill and professionalism with which counsel prosecuted the case and the performance and quality of opposing counsel"). Defense counsel are likewise highly skilled class action litigators from a globally-recognized law firm, and they defended NRG's interests at every turn up

---

and various other benchmark decisions in the TCPA field, *see, e.g.*, *Satterfield v. Simon Schuster, Inc.*, 569 F.3d 946 (9th Cir. 2009) (Ninth Circuit seminal decision applying the TCPA to text messages).

to the parties' final settlement talks. In the end, Class Counsel's skill and expertise was necessary to match the caliber of NRG's defense, and that skill and expertise should be recognized and fairly compensated. *See Milliron v. T-Mobile USA, Inc.*, No. 08-4149 (JLL), 2009 WL 3345762, at *10 (D.N.J. Sept. 10, 2009)*, as amended* (Sept. 14, 2009), *aff'd*, 423 F. App'x 131 (3d Cir. 2011) (court granted class counsel's fee request where defendants were represented by a leading law firm and both parties vigorously litigated the case).

Thus, this factor likewise supports the requested fee.

### 4. *The litigation involved uncertain legal issues and lasted over two years in duration.*

As for the fourth factor, litigation in this matter has been a costly and lengthy process for both parties. As discussed, the parties engaged in comprehensive discovery—which involved serving various third-party subpoenas and opening two miscellaneous actions in outside districts to enforce them—to allow Class Counsel to adequately assess the merits of the case and the benefits of settlement versus continued litigation. (Balabanian Decl. ¶ 9.) However, settlement did not come quickly, as evidenced by the failure of the first mediation. (*Id.* ¶ 12.) When settlement discussions began over a year ago, the parties were far apart, from the structure of the settlement to the size of the class and the amount to be paid. (*Id.* ¶ 13.) It took numerous settlement communications, and at times, weekly teleconferences and email exchanges before making any progress on those fronts.

(*Id.*)

At every step of the way in this case, NRG Residential raised thorny and unsettled questions of law, making negotiations contentious and complex. (*Id.* ¶ 19.) NRG Residential tried to dismiss the action by arguing that Plaintiff lacked Article III standing to sue, and reserved its right to tender to Plaintiff an involuntary settlement offer, in the hopes that the outcome in *Campbell-Ewald* would moot Plaintiff's representative claims. Thus, from the outset of the litigation, the law regarding key jurisdictional questions was in flux, and for months the case's livelihood hinged on not one, but two contentious Supreme Court decisions. In fact, the law on Article III standing arguably remained an open issue until last month, when the Supreme Court finally denied a second petition for writ of certiorari in *Spokeo v. Robins*. *See Spokeo, Inc. v. Robins*, -- S. Ct. -- , 2018 WL 491554 (Mem.) (Jan. 22, 2018).

Beyond that, summary judgment presented another significant legal hurdle for Plaintiff, who bore the burden of proving that NRG Residential was vicariously liable for the phone calls placed by the third-party lead generators with whom it contracted. (Balabanian Decl. ¶ 19.) *See Henderson v. United Student Aid Funds, Inc.*, No. 13-cv-01845, 2017 WL 766548, at *8 (S.D. Cal. Feb. 28, 2017) (granting summary judgment to defendant in TCPA case on vicarious liability); *Kristensen v. Credit Payment Servs. Inc.*, No. 12-cv-00528, 2015 WL 4477425, at *1 (D. Nev.

July 20, 2015) (granting summary judgment to defendants on issues of vicarious

liability in TCPA class action); *Thomas v. Taco Bell Corp.*, 582 F. App'x 678,

679–80 (9th Cir. 2014) (affirming grant of summary judgment to defendant finding

no vicarious liability in TCPA class action). In short, Class Counsel "faced

significant substantive and procedural defenses," and Plaintiff's victory was at all

times uncertain at best. *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 740 (3d

Cir. 2001) (internal citation omitted). Thus, the complexity and duration of the

litigation supports approving the requested attorneys' fees.

      5.     *The risk of non-payment.*

     Next, the risk Class Counsel undertook in prosecuting Plaintiff's case should

also be considered when assessing the fee award. *Gunter,* 223 F. 3d at 199. There

is a simple reason to reward such risk: "ensuring that competent counsel continue

to be willing to undertake risky, complex, and novel litigation." *Id.* at 198 (citing

*Deposit Guaranty Nta'l Bank v. Roper*, 445 U.S. 326, 338-39 (1980) (recognizing

the importance of a financial incentive to entice qualified attorneys to devote their

time to complex, time-consuming cases in which they risk non-payment)). Class

Counsel assumed these risks by taking the matter on a contingency basis

(Balabanian Decl. ¶ 20.), and such risk was only amplified here by the fact that

classes of plaintiffs in similar cases have lost on similarly asserted legal theories.

*Gunter*, 233 F.3d at 199; *see also In re Capital One*, 80 F. Supp. 3d at 806 (finding

that the "average TCPA case" has just a "43% chance of success"). As detailed above, this litigation featured many of the dangers—both at the pleadings stage and on the merits—that make the odds of succeeding in a TCPA case worse than a coin flip. (Balabanian Decl. ¶ 19.)

> 6.   *Class Counsel devoted substantial time and resources to this case.*

To date, Class Counsel have devoted a tremendous amount of time and resources to this litigation. Specifically, litigating this case has required Class Counsel to expend time investigating Plaintiff's claims, preparing and amending the pleadings, negotiating with defense counsel (and briefing the Court) on class certification, and conducting comprehensive discovery that required Class Counsel to track down various third parties—at least one of whom was located outside of the country—and initiate miscellaneous actions in other states to ensure that the information necessary to vigorously purse Plaintiff's claims was obtained. (Balabanian Decl. ¶ 28.) In addition to that, Class Counsel expended a significant amount of time preparing mediation materials, participating in a private mediation with Professor Green, exchanging numerous settlement communications with defense counsel, attending an in-person settlement conference with Magistrate Goodman, and thereafter, negotiating the details of the Settlement and designing a notice plan that would ultimately be worthy of approval from this Court. (*Id.* ¶ 16.)

The work performed on these tasks necessarily prevented Class Counsel from pursuing other matters. (*Id.* ¶ 28.)

Finally, and related to this factor, there can be no serious contention that the relief obtained in the Settlement is attributable to work done by other groups, such as government agencies. (*Id.* ¶ 28 n. 5) *See AT&T*, 455 F.3d at 165 (explaining that courts in the Third Circuit also consider whether Class Counsel benefitted from "the efforts of other groups, such as government agencies conducting investigations." (citation omitted).[11]  Accordingly, Class Counsel's substantial—and sole—effort in this case weighs in favor of approving the requested attorneys' fee.

### 7.   An award of one third of the Settlement Fund fits squarely within the range to awards in similar cases.

The seventh factor—comparing the requested fee award with other awards in comparable settlements—likewise supports approval. Fees in the Third Circuit "appear to fall in the range of nineteen to forty-five percent." *In re General Motors,* 55 F.3d at 822. The requested award in this case is one-third—or

---

[11]     One other TCPA case—*Wilens v. NRG Energy, Inc.*, *et al.*, No. 15-cv-01128 (C.D. Cal.)—was filed against NRG Residential in California state court and is now currently proceeding in the Central District. Although that case was filed a few weeks before the instant matter, Class Counsel was not aware of its existence when they filed the instant matter, nor has Class Counsel relied on the information obtained in that case or the efforts of counsel involved in that case in any way. (Balabanian Decl. ¶ 28 n. 5.)

33.333%—of the Settlement Fund. This is a standard figure in this Circuit for recovery in a class action brought on a contingency fee basis. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 at 306-07; *Rowe v. E.I. Dupont de Nemours & Co.,* 2011 WL 3837106, at *22; *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 134 (D.N.J. 2002) (collecting cases awarding class counsel fees of 33.33% of settlement fund); *In re Safety Components, Inc. Sec. Litig.,* 166 F. Supp. 2d 72, 102 (D.N.J. 2001) (granting award of 33.33% in common fund case and citing to ten cases from this Circuit holding the same). This percentage is also consistent with awards in TCPA class actions nationwide,[12] as well as the Third Circuit's recent decision in *Landsman & Funk, P.C. v. Skinder-Strauss Associates*, No. 15-cv-

---

[12]    *Bridgeview Health Care Ctr., Ltd. v. Jerryclark*, No. 09-cv-05601, 2015 WL 4498741, at *2 (N.D. Ill. July 23, 2015) (awarding one-third of common fund in TCPA class action); *Hageman v. AT & T Mobility LLC*, No. 13-cv-50-BLG-RWA, 2015 WL 9855925, at *4 (D. Mont. Feb. 11, 2015) (approving fee award of "$15 million, or one-third of the common fund recovery" in TCPA class action settlement against AT&T); *Saf--T--Gard Int'l, Inc. v. Seiko Corp. of Am.*, No. 09-cv-0776 (N.D. Ill. Jan. 14, 2011) (awarding one-third of common fund in multimillion dollar TCPA class action); *Vandervort v. Balboa Capital Corp.*, 8 F. Supp. 3d 1200, 1210 (C.D. Cal. 2014) ("Accordingly, the Court awards attorneys' fees and costs in the amount of $1.1 million, or 33% of the $3.3 million settlement fund ceiling amount."); *Lees v. Anthem Ins. Companies Inc.*, No. 13-cv-01411, 2015 WL 3645208, at *4 (E.D. Mo. June 10, 2015) (approving fees in TCPA settlement representing "34% of the actual fund available to Class Members"); *Kolinek*, 311 F.R.D. 483 at 501, *appeal dismissed* (Jan. 27, 2016), *appeal dismissed* (Feb. 1, 2016), *appeal dismissed* (Feb. 3, 2016) (awarding 36% of common fund in TCPA class action settlement); *Spine & Sports Chiropractic, Inc. v. ZirMed, Inc.*, No.13-cv-00489, 2015 WL 9413143, at *1 (W.D. Ky. Dec. 22, 2015) (approving one-third of fund as attorneys' fees).

02485, 2016 WL 611441, at *3 (3d Cir. Feb. 16, 2016), which affirmed a one-third award of a reversionary settlement fund in TCPA class action case.

As such, this factor likewise favor approval.

> 8.   *Plaintiff's private contingent fee agreement with Class Counsel is for 33% of the Recovery.*

As to the next factor, the Court must also "ensure that the award is consistent with what an attorney would have received if the fee were negotiated on the open market." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 155 ("the percentage-of-the-fund method of awarding attorney fees in class actions should approximate the fee that would be negotiated if the lawyer were offering the services in the private marketplace") (internal citations omitted). In that regard, courts often look at the actual fee agreement between the client and her counsel to determine if a requested percentage fee award is reasonable. *See, e.g., Assessment Techs. of WI, LLC v. WIREdata, Inc.*, 361 F.3d 434, 438 (7th Cir. 2004) ("The best evidence of the value of the lawyer's services is what the client agreed to pay him."); *In re Safety Components, Inc.*, 166 F. Supp. 2d at 104–05 (in order to ensure that "the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers," courts should "accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel") (citing *In re Cendant*, 264 F.3d at 283).

Here, the actual fee agreement between Plaintiff and Class Counsel supports an award of fees equal to one-third of the Settlement Fund. That is, the fee agreement is structured as a contingency arrangement whereby Class Counsel is to receive up to one-third of any common fund created—an amount that is eminently reasonable. (Balabanian Decl., ¶ 28.) *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 155 (collecting cases showing that "[a]ttorneys regularly contract for contingent fees between 30% and 40% with their clients in non-class, commercial litigation").

Accordingly, this factor supports a finding that the requested fee award of one-third of the $7 million common fund is reasonable.

9.   *The Settlement's terms are strong, if not innovative.*

Finally, in regards to the "innovative terms of the Settlement," Class Counsel have used their experience and expertise in the TCPA and class action field to create a non-reversionary settlement that affords significant monetary relief to the Settlement Class. Thus, while the terms of this Settlement are not necessarily "innovative," they are certainly strong. This factor is therefore neutral, at worst.

**B.   A Lodestar Crosscheck Confirms the Reasonableness of the Requested Fee.**

The requested attorneys' fees are equally reasonable under the lodestar method. The lodestar is calculated by multiplying the number of hours Class Counsel worked on a case by a reasonable hourly billing rate for such services. *In*

*re AT&T Corp.*, 455 F.3d at 164. The resulting base lodestar may then be enhanced by application of a reasonable risk-multiplier to account for the contingent nature of the action and/or other factors—namely, the risk of non-payment and quality of counsel's work. *Id.* ("The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier."); *see also In re Rite Aid Corp. Sec. Litig.,* 396 F.3d at 306 (allowing for a multiplier to be applied to "account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work").

As reflected in the chart included within the attached Balabanian Declaration, Class Counsel's adjusted lodestar as of February 6, 2018 is $975,427.00. (Balabanian Decl. ¶ 22.) *See* Third Circuit Task Force, *Selection of Class Counsel*, 105 (2002) (when using the lodestar as a cross-check, "the court should be satisfied with a summary of the hours expended by all counsel . . ."); *Milliron*, 2009 WL 3345762, at *15 ("To delve deeply into the thousands of hours claimed by the many attorneys involved in this matter would undermine the Court's reliance on the percentage-of-recovery method."). This attorney time was reasonably spent and necessary for the successful prosecution of this case. (Balabanian Decl. ¶ 25.) The attorney and staff rates used to calculate Class Counsel's base lodestar are also comparable to those charged by attorneys with equivalent experience, skill, and reputation for similar services in the New Jersey

and Chicago legal markets, as well as other comparable markets throughout the country, and they have previously been approved by courts in this Circuit and nationwide. (*Id.* ¶ 26.) *See, e.g.*, *Mirakay v. Dakota Growers Pasta Co.*, No. 13-cv-04429, 2014 WL 5358987, at *14 (D.N.J. Oct. 20, 2014) (deeming reasonable rates ranging from $350 to $850 per hour); *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. 08-cv-02177, 2013 WL 5505744, at *33 (D.N.J. Oct. 1, 2013) (surveying the 2012 National Law Journal Annual Billing Survey and finding a partner's billing rate of $750 per hour is lower than the top rate the NLJ reports is charged by the New Jersey-based Gibbons firm of $815). Additionally, the hourly rates used to calculate Class Counsel's lodestar are the same as those charged to Class Counsel's hourly-paying clients (Balabanian Decl. ¶ 27), which supports a finding that their fee request is reasonable as well. *See In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. at 157 ("The Third Circuit, as well as other courts, has held that an attorney's customary billing rate is the proper starting point for calculating fees.") (internal citation omitted). And, of course, given the contingent nature of the requested fee award, Class Counsel had no incentive to "overbill" or expend unnecessary time or resources on this litigation. (Balabanian Decl. ¶ 20.) As such, the Court should have confidence that Class Counsel's base lodestar is both fair and reasonable.

Finally, and as noted above, the lodestar calculation does not end with this

base amount. Instead, the base lodestar is often enhanced with a reasonable risk-multiplier. Although "the multiplier need not fall within any pre-defined range," *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 307, courts in this Circuit have approved multipliers of up to 2.99 in even relatively simple cases. *See In re Prudential*, 148 F.3d at 341 ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.") (internal quotation and citations omitted); *Demmick v. Cellco P'ship*, No. 06-cv-02163, 2015 WL 13643682, at *17 (D.N.J. May 1, 2015) ("[A] lodestar multiplier of 3.97 is within the range of the multipliers normally approved by the courts in the Third Circuit and this Court follows suit."); *In re AremisSoft Corp. Sec. Litig.,* 210 F.R.D. 109, 135 (D.N.J. 2002) (approving a 4.3 lodestar multiplier); *In re Cendant*, 243 F.3d 722 at 735-36 (approving multiplier of 3 although case "was neither legally nor factually complex," there was a "minimal amount of motion practice," and the parties submitted a settlement agreement within four months of the filing date).

In this case, a multiplier of only 2.3 need be applied to Class Counsel's base lodestar in order to yield the requested one-third fee award. Such a multiplier has not only been found to be reasonable in similar cases, but is particularly reasonable (and warranted) here given the results Class Counsel were able to obtain on behalf of the Settlement Class. *See id.*; *see also supra* Section II.A.1. As such, the requested fee award is undoubtedly reasonable in this regard as well.

## IV.   A $5,000 INCENTIVE AWARD TO PLAINTIFF IS REASONABLE AND SHOULD BE APPROVED.

The agreed-upon incentive award of $5,000 for Plaintiff Dobkin's services as class representative is also a fair and reasonable one. A number of reasons support granting incentive awards to class representatives: "(1) just as with class counsel, the class representatives have conferred a benefit on all class members by their willingness to bring the litigation; (2) class representatives should be rewarded for taking action that is in the public interest; and (3) public policy favors compensation for class representatives for taking on risks of litigation on behalf of absent class members." *Sullivan v. DB Investments, Inc*., No. 04-cv-02819, 2008 WL 8747721, at * 37 (D.N.J. May 22, 2008).

Here, Plaintiff contributed significantly to the case and should be compensated for it. He kept in regular contact with Class Counsel to apprise himself of and to ask questions about each stage of the litigation. (Balabanian Decl. ¶ 30.) He assisted Class Counsel in their initial investigation by providing valuable information relating to his receipt of the phone calls at issue and he responded to requests for additional information throughout the settlement process. (*Id*.) Also, in addition to the completion of written discovery, Plaintiff's deposition was close at hand when the parties finally reached agreement, and although the parties never proceeded with it, he had made the time commitment to prepare for and attend his own deposition should it have been necessary. (*Id*. ¶ 31.)

All told, the amount requested here is a modest incentive award for Plaintiff's valuable contributions, particularly compared to amounts awarded throughout this and other circuits. *See Varacallo v. Massachusetts Mut. Life Ins. Co.*, 226 F.R.D. 207, 257 (D.N.J. 2005) (collecting cases awarding up to $25,000 to named plaintiffs for their work as class representatives). "Like the attorneys in this case, [Plaintiff] ha[s] conferred benefits on all other class members and [he] deserve[s] to be compensated accordingly." *Id.* (quoting *In re Linerboard Antritrust Litig.*, 2004 WL 1221350, at *18 (E.D. Pa. June 2, 2004)). Thus, his request for a $5,000 incentive award is reasonable and merits approval.

## V.    CONCLUSION

For the reasons discussed above, Plaintiff Michael Dobkin respectfully requests that this Court enter an order (1) approving the requested fee award in the amount of $2,333,333, (2) approving the requested incentive award in the amount of $5,000, and (3) providing such further relief as the Court deems just and proper.

Respectfully submitted,

**MICHAEL DOBKIN**, individually, and on behalf of a class of similarly situated individuals,

Dated: February 6, 2018

By: /s/ Stefan Coleman
        One of Plaintiff's Attorneys

Rafey S. Balabanian
rbalabanian@edelson.com

Eve-Lynn Rapp
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Stefan L. Coleman
(NJ Attorney No. 000382009)
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, LLC
1071 Madison Ave., Suite 1
Lakewood, New Jersey 08701
Tel: 877.333.9427
Fax: 888.498.8946

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 6, 2018, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


/s/＿＿＿Stefan Coleman＿＿＿＿＿