Stefan Louis Coleman (NJ Attorney No. 000382009)
law@stefancoleman.com
Law Offices of Stefan L. Coleman
1072 Madison Avenue, Suite 1
Lakewood, New Jersey 08701
Tele: 877-333-9427

Rafey S. Balabanian (*pro hac vice*)
rbalabanian@edelson.com
Eve-Lynn J. Rapp (*pro hac vice*)
erapp@edelson.com
EDELSON PC
123 Townsend Street, Suite 100
San Francisco, California 94107

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY, TRENTON DIVISION

| | |
|---|---|
| MICHAEL DOBKIN, individually and on behalf of all others similarly situated, <br><br> *Plaintiff*, <br><br> v. <br><br> NRG RESIDENTIAL SOLAR SOLUTIONS LLC, a Delaware limited liability company, <br><br> *Defendant*. | Case No. 3:15-cv-05089 <br><br> Hon. Brian R. Martinotti, USDJ <br> Hon. Lois H. Goodman, USMJ |

## PLAINTIFF'S MOTION FOR AND MEMORANDUM IN SUPPORT OF
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ................................. 3

       A.    Dobkin Alleges NRG Violates the TCPA ........................................ 3

       B.    The TCPA and Vicarious Liability .................................................. 5

       C.    Motion Practice and Discovery ........................................................ 6

       D.    Nature of the Settlement Negotiations ........................................... 10

       E.    The *Wilens v. NRG Energy* Case in California ............................... 12

III.   TERMS OF THE SETTLEMENT ............................................................ 14

       A.    Class Definition .............................................................................. 15

       B.    Monetary Relief .............................................................................. 15

       C.    Incentive Award and Attorneys' Fees ............................................ 15

       D.    Payment of Notice and Administrative Expenses .......................... 16

       E.    Release ............................................................................................. 16

IV.    THE IMPLEMENTED NOTICE PLAN COMPORTS
       WITH DUE PROCESS AND THE NOTICE OBJECTIONS
       ARE MERITLES ....................................................................................... 16

       A.    The Court-Approved Notice was Directly Provided to
             95% of the Settlement Class ........................................................... 17

       B.    The Objections to Notice Are Meritless ......................................... 19

V.     THE SETTLEMENT IS FAIR, REASONABLE, AND
       ADEQUATE AND WARRANTS FINAL APPROVAL ......................... 23

**A.** **The Settlement Is Presumably Fair**.....................................24

**B.** **The *Girsh* Factors All Favor Approval** ...........................25

    *1.* *The complexity, expense, and likely duration of continued litigation justify final approval of the Settlement* ...................................................26

    *2.* *The reaction of the Settlement Class has been overwhelmingly favorable* ......................................27

    *3.* *Class Counsel had sufficient information at this stage in the litigation to evaluate the merits and reasonableness of the Settlement* ...........................29

    *4.* *Establishing liability and damages would be risky*.................32

    *5.* *Maintaining class action status through trial would not be certain* .....................................................34

    *6.* *Defendant has represented it cannot withstand a significantly greater judgment* ...................................36

    *7.* *The Settlement amount is within the range of reasonableness in light of the recovery and attendant risks of litigation* ...................................................38

**V.** **THE COURT SHOULD OVERRULE THE WILENS AND ABARCA OBJECTIONS** .................................................41

    **A.** **The Class Has No Conflicts and the Settlement Was Not Collusive** ...............................................41

    **B.** **The Release of Claims is Appropriate**.............................43

    **C.** **The Claim Form was Necessary and Proper** ...................45

    **D.** **Time Sheets are Not Required for a Lodestar Crosscheck**..........................................................47

ii

**VI.    CONCLUSION**..............................................................................................48

## <u>TABLE OF AUTHORITIES</u>

### <u>United States Supreme Court</u>

*Campbell-Ewald Co. v. Gomez,*
  136 S. Ct. 663 (2016) ...................................................................................6

*Mims v. Arrow Fin. Svcs's, LLC,*
  132 S. Ct. 740 (2012) ...................................................................................5

*Spokeo v. Robins,*
  136 U.S. 1540 (2016) ...................................................................................8

### <u>United States Court of Appeals</u>

*In re Baby Prod. Antitrust Litig.,*
  708 F.3d 163 (3d Cir. 2013) .......................................................................40

*Bryan v. Pittsburgh Plate Glass Co.,*
  494 F.2d 799 (3d Cir. 1974) .......................................................................26

*In re Cendant Corp. Litig.,*
  264 F.3d 201 (3d Cir. 2001) ..................................................................*passim*

*Gager v. Dell Fin. Serv., LLC,*
  727 F.3d 265 (3d Cir. 2013) .......................................................................5

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995) ...................................................................*passim*

*Girsh v. Jepson.*
  521 F.2d 153 (3d Cir. 1975) ..................................................................*passim*

*Grimes v. Vitalink Comm. Corp.,*
  17 F.3d 1553 (3d Cir. 1994) .......................................................................45

*Ira Holtzman, CPA v. Turza,*
  728 F.3d 682 (7th Cir. 2013) ......................................................................26

iv

*Kaufman v. Am. Express Travel Related Serv. Co., Inc.*,
   877 F.3d 276 (7th Cir. 2017)..........................................................................44

*Kristensen v. Credit Payment Servs. Inc.*,
   879 F.3d 1010 (9th Cir. 2018)..................................................................27, 33

*Landsman & Funk, P.C. v. Skinder-Strauss Assoc.*,
   No. 08-cv-03610, 2015 WL 2383358 (D.N.J. May 18, 2015),
   *aff'd*, 639 F. App'x 880 (3d Cir. 2016)..........................................................38

*Milliron v. T-Mobile USA, Inc.*,
   No. 08-cv-04149, 2009 WL 3345762 (D.N.J. Sept. 10, 2009),
   *aff'd*, 423 F. App'x 131 (3d Cir. 2011)..........................................................45

*In re Online DVD-Rental Antitrust Litig.*,
   779 F.3d 934 (9th Cir. 2015)....................................................................22, 23

*In re Pet Food Prods. Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010)............................................................................24

*In re Prudential Ins. Co. Am. Sales Practices Litig.*,
   148 F.3d 283 (3d Cir. 1998)....................................................................*passim*

*Simmons v. Charter Comm., Inc.*,
   222 F. Supp. 3d 121 (D. Conn. 2016)
   *aff'd*, 686 F. App'x 48 (2d Cir. 2017)............................................................27

*Stoetzner v. U.S. Steel Corp.*,
   897 F.2d 115 (3d Cir. 1990)............................................................................28

*Thomas v. Taco Bell Corp.*,
   582 F. App'x 678 (9th Cir. 2014) ...................................................................33

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)................................................................24, 34, 38

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
   899 F. Supp. 1297, 1301 (D.N.J. 1995)
   *aff'd*, 66 F.3d 314 (3d Cir. 1995) ...................................................................28

*Williams v. Gen. Elec. Capital Auto Lease, Inc.*,
  159 F.3d 266 (7th Cir.1998)...................................................................44, 45

## **United States District Courts**

*In re Am. Family Enterprises,*
  256 B.R. 377 (D.N.J. 2000) ..................................................................23, 44

*In re Apple iPhone 4 Prod. Liab. Litig.*,
  No. 10-md-02188, 2012 WL 3283432 (N.D. Cal. Aug. 10, 2012) ..............46

*Aranda v. Caribbean Cruise Line, Inc.*,
  179 F. Supp. 3d 817 (N.D. Ill. 2016) .........................................................27

*Arthur v. Sallie Mae, Inc.*,
  No. 10-cv-00198, Dkt. 266 (W.D. Wash. Sept. 17, 2012)...........................39

*In re AT&T Corp. Sec. Litig.*,
  No. 00-cv-05364, 2005 WL 6716404 (D.N.J. Apr. 25, 2005)................37, 48

*Barani v. Wells Fargo Bank, N.A.*,
  No. 12-cv-02999, Dkt. 32 (S.D. Cal. Mar. 6, 2015) ....................................29

*Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*,
  513 F. Supp. 2d 322 (E.D. Pa. 2007) ..........................................................31

*In re Capital One Tel. Consumer Prot. Act Litig.*,
  80 F. Supp. 3d 781 (N.D. Ill. 2015) ......................................................38, 39

*Careccio v. BMW of N. Am. LLC*,
  No. 08-cv-02619, 2010 WL 1752347 (D.N.J. Apr. 29, 2010) .....................39

*Castro v. Sanofi Pasteur Inc.*,
  No. 11-cv-007178, 2017 WL 4776626 (D.N.J. Oct. 23, 2017) ...................32

*City Select Auto Sales, Inc. v. David Randall Associates, Inc.*,
  No. 11-cv-02658, 2014 WL 4755487 (D.N.J. Sept. 24, 2014) ....................32

*Couser v. Comenity Bank*,
  125 F. Supp. 3d 1034 (S.D. Cal. 2015) .......................................................29

*Dennis v. Trans Union, LLC*,
No. 14-cv-02865, 2014 WL 5325231 (E.D. Pa. Oct. 20, 2014) ............33, 34

*Dobkin v. NRG Residential Solar Solutions, LLC*,
No. 2:16-mc-114 (C.D. Cal. 2016) ..............................................................9

*Dobkin v. NRG Residential Solar Solutions, LLC*,
No. 2:16-mc-00027-SPC-MRM (M.D. Fla. 2016) ........................................9

*Dobkin v. NRG Residential Solar Solutions, LLC*,
No. 1:17-mc-0005 (E.D. Va. 2017) ..............................................................9

*In re Flonase Antitrust Litig.*,
291 F.R.D. 93 (E.D. Pa. 2013) ....................................................................40

*Forman v. Data Transfer, Inc.*,
164 F.R.D. 400 (E.D. Pa.1995) ..............................................................26, 36

*Gehrich v. Chase Bank USA, N.A.*,
316 F.R.D. 215 (N.D. Ill. 2016) ......................................................38, 40, 45

*Golan v. Veritas Entm't, LLC*,
No. 14-cv-00069, 2017 WL3923162 (E.D. Mo. Sept. 7, 2017) ..................34

*Hashw v. Dept. Stores Nat'l Bank*,
182 F. Supp. 3d 935 (D. Minn. 2016) ..........................................................39

*Henderson v. United Student Aid Funds, Inc.*,
No. 13-cv-01845, 2017 WL 766548 (S.D. Cal. Feb. 28, 2017)....................33

*Jamison v. First Credit Servs., Inc.*,
290 F.R.D. 92 (N.D. Ill. 2013) ....................................................................36

*Kazemi v. Payless Shoesource, Inc.*,
No. 09-cv-05142, Dkt. 94 (N.D. Cal. Apr. 2, 2012) ....................................39

*Kolinek v. Walgreen Co.*,
311 F.R.D. 483 (N.D. Ill. 2015) ......................................................29, 39, 46

*Landsman & Funk, P.C. v. Skinder-Strauss Assoc.*,
    No. 08-cv-03610, 2015 WL 2383358 (D.N.J. May 18, 2015),
    *aff'd*, 639 F. App'x 880 (3d Cir. 2016) ........................................................38

*Mangone v. First USA Bank*,
    206 F.R.D. 222 (S.D.Ill.2001) ......................................................................47

*Marin v. Comenity Bank, LLC*,
    No. 16-cv-00737, 2017 WL 3670030 (E.D.N.Y. July 11, 2017) .................21

*Milliron v. T-Mobile USA, Inc.*,
    No. 08-cv-04149, 2009 WL 3345762 (D.N.J. Sept. 10, 2009),
    *aff'd*, 423 F. App'x 131 (3d Cir. 2011) .......................................................45

*In re Ocean Power Techs., Inc.*,
    No. 14-cv-03799, 2016 WL 6778218 (D.N.J. Nov. 15, 2016) .........25, 30, 43

*In re Philips/Magnavox Television Litig.*,
    No. 09-cv-03072, 2012 WL 1677244 (D.N.J. May 14, 2012) .....................28

*In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*,
    962 F. Supp. 450 (D.N.J. 1997) ...................................................................35

*In re Safety Components, Inc. Sec. Litig.*,
    166 F. Supp. 2d 72 (D.N.J. 2001) ................................................................32

*Serio v. Wachovia Sec., LLC*,
    No. 06-cv-04681, 2009 WL 900167 (D.N.J. Mar. 31, 2009) ......................17

*Simmons v. Charter Comm., Inc.*,
    222 F. Supp. 3d 121 (D. Conn. 2016)
    *aff'd,* 686 F. App'x 48 (2d Cir. 2017) .........................................................27

*Skeen v. BMW of N. Am., LLC*,
    No. 13-cv-01531, 2016 WL 4033969 (D.N.J. July 26, 2016) .....................41

*Weiss v. Mercedes-Benz of N. Am., Inc.*,
    899 F. Supp. 1297, 1301 (D.N.J. 1995)
    *aff'd*, 66 F.3d 314 (3d Cir. 1995) ...............................................................28

*Wilens v. Heart Savers, LLC*,
    15-cv-01139, Dkt. 32 (C.D. Cal.) ................................................................40

*Wilens v. Heart Savers, LLC*,
    15-cv-01139, Dkt. 33 (C.D. Cal.) ................................................................43

*Wilens v. NRG Energy Inc. et al.*,
    No. 15-cv-01128, Dkt. 1 (C.D. Cal. 2015)..............................................2, 13

*Wilens v. NRG Energy Inc. et al.*,
    No. 15-cv-01128, Dkt. 41 ............................................................................14

*Wilens v. NRG Energy Inc. et al.*,
    No. 15-cv-01128, Dkt. 63 (C.D. Cal. 2015).................................................13

*Wilens v. NRG Energy Inc. et al.*,
    No. 15-cv-01128, Dkt. 76 (C.D. Cal. 2015).................................................14

*Wilens v. NRG Energy Inc. et al.*,
    No. 15-cv-01128, Dkt. 77 (C.D. Cal. 2015).................................................14

*Wilens v. NRG Energy Inc. et al.*,
    No. 15-cv-01128, Dkt. 88 (C.D. Cal. 2015).................................................14

*Wilkins v. HSBC Bank Nev., N.A.*,
    No. 14-cv-00190, 2015 WL 890566 (N.D. Ill. Feb. 27, 2015) .........28, 29, 40

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02-cv-03288, 2004 WL 2591402 (S.D.N.Y. Nov. 12, 2004).................47

*Wright v. Nationstar Mortage LLC*,
    No. 14-cv-10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) .................37

*Zarichny v. Complete Payment Recovery Servs., Inc.*,
    80 F. Supp. 3d 610 (E.D. Pa. 2015) ............................................................14

**State Court of Appeals**

*Larson v. AT&T Mobility LLC*,
    687 F.3d 109 (3d Cir. 2012).........................................................................17

## Statutory Provisions

47 U.S.C. § 227 ...............................................................................*passim*

Fed. R. Civ. P. 23 ..........................................................................*passim*

L. Civ. R. 54.2 ....................................................................................48

## Miscellaneous Authorities

47 C.F.R. § 64.1200 ..............................................................................6

7AA Wright et al.,
    *Federal Practice & Procedure* § 1789.1 (3d ed. 2005) .........................21, 22

Do-Not-Call Implementation Act, Pub. L.
    No. 108-10, 117 Stat 557 (Mar. 11, 2003) .......................................5

Federal Judicial Center,
*Judges' Class Action Notice & Claims Process Checklist &*
    *Plain Language Guide* 3 (2010) ................................................18

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*,
    18 F.C.C.R. 14014 (2003) ...............................................................5

*In the Matter of the Joint Petition Filed by Dish Network, LLC et al. for*
*Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*,
Declaratory Ruling,
    28 FCC Rcd. 6574 (F.C.C. May 9, 2013) ..........................................6, 32, 33

Newberg & Conte,
    2 NEWBERG ON CLASS ACTIONS, §11.50 (4th ed. 2002) ..............................24

Report of the Third Circuit Task Force, Selection of Class Counsel,
    208 F.R.D. 340, 423 (2002) .........................................................48

## I.      INTRODUCTION

The Class Action Settlement agreement (the "Settlement" or "Agreement")[1] Plaintiff Michael Dobkin reached with Defendant NRG Residential Solutions LLC is an excellent result for the class and should be approved. The settlement resolves claims that NRG Residential is responsible for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 (the "TCPA") allegedly perpetrated by third-party telemarketers that made "robocalls" to consumers promoting the sale and installation of NRG Residential Solar Solutions LLC's ("Defendant" or "NRG Residential") solar panels. The Settlement affords each claiming class member ("Settlement Class Member" or "Class Member") around $175. This relief is at the high-end of what is typical in the well-worn TCPA settlement landscape.

But like everything else in life, reaching resolution was hard work. NRG Residential's position on both liability and Dobkin's entitlement to requested discovery related to the third-party lead generators resulted in a letter motion to compel before Magistrate Judge Lois H. Goodman, and motions to compel subpoena responses in multiple miscellaneous actions in federal courts throughout the country. While discovery and motion practice ran their course, Dobkin and NRG tried repeatedly to reach resolution—including with nationally recognized

---

[1]      A copy of the Settlement Agreement is attached as Exhibit 1. Unless expressly noted otherwise, all capitalized terms shall have the respective meanings ascribed to the same terms in the Settlement Agreement.

mediator, Professor Eric Green. Ultimately, it was Judge Goodman who was able to help the Parties reach an arm's-length negotiated settlement through numerous phone conferences spanning several months and an all-day, in-chambers settlement conference. After a full day of back and forth negotiations, that final round resulted in the Parties accepting Judge Goodman's mediator's proposal, which formed the basis for the Settlement now presented to this Court.

Since the Court entered preliminary approval on November 17, 2017, the Court-approved notice has been directly delivered to 95% of the Settlement Class and the deadline to file claims, request exclusion, or object has expired. (*See* Dkt. 84; *see also* Declaration of Rachel Christman of Kurtzman Carson Consultants (the "Christman Decl."), Dkt. 95.) Given the generous relief afforded through the Settlement, it is of little surprise that the number of claims is well above-average and that only three (3) individuals have requested to be excluded. In fact, the only opposition to the Settlement comes from a pair of Los Angeles lawyers who have a similar case against NRG in the Central District of California. (*See Wilens v. NRG Energy Inc. et al.*, No. 15-cv-01128, Dkt. 1. (C.D. Cal. 2015).) Those objections are, for the most part, based on a misunderstanding of the litigation history of this case, the discovery conducted in their own case, the TCPA, and class litigation generally. The remainder rely on outright false statements or are simply boilerplate gripes that are routinely overruled. And, while nothing in their litany of purported

problems should give the Court pause that the instant Settlement is anything but a great deal for the Class, perhaps acknowledging their shortcomings, the Objectors have now agreed to withdraw their objections and support the deal.[2]

As set forth herein, the Settlement is fair, reasonable, and adequate and well within the range of approval.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Dobkin Alleges NRG Violates the TCPA.

Plaintiff Dobkin initiated this case on July 1, 2015, against Defendant NRG Residential Solutions LLC and its parent, NRG Energy, Inc. (Dkt. 1.) A week later, on July 9, 2015, Dobkin also moved to certify a class of consumers who received these alleged robocalls. (Dkt. 3.) Dobkin alleged that NRG Residential, a company that sold and installed solar panels for residential use, sought to increase sales revenue through unwanted telemarking calls to consumers throughout the country, including to consumers that have registered their phone numbers with the National

---

[2]    Messrs. Wilens and Spencer have agreed to withdraw their objections after Class Counsel offered to provide them with information necessary to demonstrate why each of them were ill-founded, and to compensate them for the work completed in their related case. Class Counsel made clear that such compensation would be paid from the attorneys' fees Class Counsel stand to recover (rather than from the Class) and that any agreement would be disclosed to the Court in accordance with Fed. R. Civ. P. 23. Nevertheless, for sake of completeness and because Class Counsel believes that the objections have no basis in fact or law, Class Counsel responds to each of Objectors' arguments in detail below.

Do Not Call Registry (the "DNC Registry"). (Dkt. 28 ¶ 1.) As discovery further elucidated, however, NRG didn't make any of those calls itself. Instead, as is common in the telemarketing industry, several third-parties called "lead generators" placed the calls with the hope of discovering individuals who would be potential buyers of solar panels and then sold some of those "leads" to NRG Residential.

Dobkin further alleged that the lead generators' calls often featured artificial or prerecorded voices (commonly known as "robocalls"), that the lead generators disabled menu prompts to prevent consumers from opt-outing of receiving more of the robocalls in the future, and claimed that they were working with fictional or unrelated nonprofit or governmental entities like the "Department of Solar Energy" and the "Clean Planet Program." (*Id.* ¶ 2.) Recipients of the calls regularly complained online about receiving the calls—especially when they had listed their numbers on the national DNC Registry—and having to deal with the ineffective opt-out mechanisms. (*Id.* ¶¶ 15, 16.) Plaintiff alleged that the telemarketing calls were made without the prior express written consent of the call recipients and that the calls continued even after explicit requests to cease. (*Id.* ¶ 17.) Plaintiff further alleged that NRG Residential had a sufficient degree of involvement in the making of the calls to permit NRG Residential to be held vicariously liable under TCPA. (Dkt. 28, ¶¶ 3, 4, 17.)

4

### B.     The TCPA and Vicarious Liability.

Congress passed the TCPA in response to "voluminous consumer complaints," and to restrict telemarketing calls and prohibit "intrusive nuisance calls" it determined were an invasion of privacy. *Mims v. Arrow Fin. Svcs's, LLC*, 132 S. Ct. 740, 744 (2012); *see also Gager v. Dell Fin. Serv., LLC*, 727 F.3d 265, 268 (3d Cir. 2013) (same). As such, the TCPA is a means to combat the growing threat to privacy posed by automated telemarketing, such as those at issue in this case, and makes it unlawful, subject to certain exceptions, for any person within the United States to: "initiate any telephone call to any residential telephone line using an artificial or prerecorded voice . . . without the prior express consent of the called party." 47 U.S.C. § 227(b)(1)(B).

The DNC Registry portion of the TCPA didn't come about in its present form until 2003, when Congress enacted the Do-Not-Call Implementation Act, Pub. L. No. 108-10, 117 Stat 557 (Mar. 11, 2003), and in response, the Federal Communications Commission (the "FCC")—the agency entrusted with interpreting the TCPA—adopted rules to establish a national do-not-call registry. *See In re Rules & Regulations Implementing the Tel. Consumer Prot. Act. of 1991*, 18 F.C.C.R. 14014 (2003), ¶¶ 28-33. Through its FCC implementing regulations, the TCPA provides that "[n]o person or entity shall initiate any telephone solicitation" to "[a] residential telephone subscriber who has registered his or her

5

telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the federal government." 47 C.F.R. § 64.1200(c). This prohibition extends "to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers" as well. 47 C.F.R. § 64.1200(e).

The purpose of the TCPA is clear: to protect consumers from unwanted telemarketing. Accordingly, the FCC has made clear that liability under the TCPA will attach to persons or entities who have a high degree of involvement in the transmissions even if they did not place the calls, and that an entity may be liable under the TCPA through federal common law agency principles such as ratification even where that entity did not place the calls at issue. *See In the Matter of the Joint Petition Filed by Dish Network, LLC et al. for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules*, Declaratory Ruling, 28 FCC Rcd. 6574, 6583-84, 6587, n. 107 (F.C.C. May 9, 2013); *cf. Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 674 (2016) (finding "no cause to question" the FCC's ruling "that under federal common-law principles of agency, there is vicarious liability for TCPA violations").

### C.     Motion Practice and Discovery.

On August 25, 2015, both NRG entities moved to dismiss and filed an opposition to Dobkin's motion for class certification. (Dkts. 11, 12.) The motion to

dismiss argued that Dobkin lacked Article III standing to sue because he hadn't been injured by his receipt of the calls, and that if he had standing, the complaint failed to distinguish between the two NRG defendants. (Dkt. 11.) Dobkin amended in response, adding allegations about NRG Residential and NRG Energy's respective roles in the alleged telemarketing based on available information. (Dkt. 16.) After filing the amended complaint, NRG Energy's counsel and Class Counsel frankly discussed NRG's total lack of involvement in the alleged telemarketing and strict observance of corporate formalities. (*See* Declaration of Rafey S. Balabanian (the "Balabanian Decl.," attached as Exhibit 2 at ¶ 5.) In order to proceed to discovery and move forward with the litigation, on September 25, 2015, Dobkin agreed to dismiss Defendant NRG Energy, Inc. without prejudice and subject to be re-named if discovery proved the representations about its involvement in the telemarketing to be false. (*Id.* ¶ 6.) Dobkin then filed a Second Amended Complaint against NRG Residential, which it answered asserting twelve (12) affirmative defenses. (Dkts. 28, 31.)

After the pleadings were settled, NRG Residential moved to stay proceedings claiming that the Supreme Court's then-forthcoming decisions on Article III standing in *Spokeo v. Robins*, 136 U.S. 1540 (2016) and mootness in *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016) may deprive this Court of jurisdiction over this case. (Dkt. 27.) Dobkin opposed the requested stay (Dkt. 29),

but the Court granted NRG's request and put the case on hold. (Dkt. 32.) Once the Supreme Court issued its rulings and it was clear this case would proceed, the stay was lifted, and the Parties proceeded with discovery. (Dkts. 42, 43; Ex. 2, Balabanian Decl. ¶ 7.)

From the outset of discovery, Dobkin pressed NRG to produce information related to each and every third-party lead generator that NRG used to place calls. (Ex. 2, Balabanian Decl. ¶ 8.) Initially, NRG took the position that only the lead generators that contacted Dobkin (or that Class Counsel were already aware of) were discoverable and, as such, only identified three lead generators from whom it purchased leads: Skypath Solar, Sun Light Solar Leads, and One Touch Calls, LLC. (*Id.*) Based on their experience with TCPA cases involving lead generators and pre-suit investigation, Class Counsel knew that more lead generators were involved and continued to press NRG for this information. (*Id.* ¶ 9.) NRG ultimately identified MediaMix 365 and EcoCodes (and indicated there may be others) as the additional lead generators that may also have placed calls for NRG Residential. (*Id.* ¶ 10.) Defendant, however, refused to provide any information about the unidentified lead generators in response to Plaintiff's first set of discovery requests. (*Id.* ¶ 11.)

As a result, Plaintiff filed a Rule 37 letter motion to compel the production of this information, which was eventually supplemented with additional briefing at

the Court's request, asserting that the identities of each lead generator are discoverable because the Class includes all recipients of telemarketing calls placed on NRG's behalf, regardless of which lead generator placed the calls. (Dkts. 68, 74.)

While awaiting Judge Goodman's decision on the motion to compel, Dobkin issued subpoenas to each of the five known third-party lead generators, certain individuals associated with those entities and, various telecommunications companies the lead generators used to effectuate the calls. (Ex. 2, Balabanian Decl. ¶ 13.) In all, Dobkin issued over seventy (70) subpoenas in total. (*Id*.) And, when certain Parties refused to comply with those subpoenas, Dobkin filed miscellaneous actions pursuant to Rule 45 in district courts throughout the country to enforce them. (*Id*.)[3] Through these efforts, Dobkin obtained hundreds of documents related to the lead generators' calling practices, as well as their respective relationships with NRG Residential. (*Id.* ¶ 14.) Beyond documents, Class Counsel interviewed several employees of One Touch Calls, including its CEO, Shawn Peterson, who attested to the company's calling practices, NRG Residential's oversight of those practices, how the calls were effectuated, One Touch's business relationship with NRG Residential, and how NRG Residential

---

[3]     *See Dobkin v. NRG Residential Solar Solutions, LLC*, No. 2:16-mc-114 (C.D. Cal. 2016); *Dobkin v. NRG Residential Solar Solutions, LLC*, No. 2:16-mc-00027-SPC-MRM (M.D. Fla. 2016); *Dobkin v. NRG Residential Solar Solutions, LLC*, No. 1:17-mc-0005 (E.D. Va. 2017).

terminated that relationship after Dobkin filed this lawsuit. (*Id.* ¶ 15.) Likewise, Class Counsel took the deposition of Skypath Solar's CEO, Gianluca Guy, to similarly explore Defendant's involvement in placing the calls at issue. (*Id.* 16.)

This discovery revealed that NRG Residential was offered leads from each of the third-party lead generators referenced above as a result of the lead generators' telephone calls to consumers. (*Id.* ¶ 17.) While it was likely that the lead generators placed calls to more than the individuals who they sold as leads, NRG only received the contact information of potential customers if it purchased a lead from a lead generator. (*Id.*) In the telephonic hearings on Dobkin's motion to compel, Judge Goodman indicated her belief that Dobkin was only entitled to information about leads that NRG purchased, not to calls that resulted in leads not sold to NRG. (*Id.*¶ 18.) Judge Goodman also strongly suggested that—should she ultimately be required to issue a ruling on this issue—any determination of NRG's liability (and thus discovery) would be limited to calls made resulting in a purchased lead, i.e. a violation by a lead generator that was arguably ratified by NRG. (*Id.*)

### D.   Nature of the Settlement Negotiations.

During discovery and motion practice, Dobkin and NRG engaged in settlement discussions on numerous occasions. (*Id.*) First, on September 27, 2016, Dobkin and NRG participated in a one-day mediation with acclaimed mediator,

Professor Eric Green of Resolutions, LLC. (*Id.*¶ 20.) Going into the mediation, Class Counsel was only aware of around 50,000 leads that NRG had purchased from the three (3) lead generators it was aware of at the time (i.e., Skypath Solar, Sun Light Solar, and One Touch). (*Id.* ¶ 21.) Knowing that these purchased leads represented both (i) a subset of the calls made, and (ii) leads purchased from non-identified lead generators, the mediation did not resolve the case. (*Id.*) Dobkin returned to discovery. (*Id.*)

In March 2017, the Parties decided to revisit settlement talks, this time with the assistance of Magistrate Judge Goodman. (*Id.* ¶ 22.) To that end, Dobkin made a pre-mediation demand on NRG. (*Id.* ¶ 23.) NRG stated that it believed it could not possibly be found liable for any calls that did not result in it purchasing a lead. (*Id*.)

As noted above, Judge Goodman appeared to agree with NRG that any determination regarding its liability would be limited to leads it purchased (not all calls made by lead generators), and given that any release would likewise be so limited, Dobkin's April 12, 2017 mediation letter to Judge Goodman limited the proposed settlement class to purchased leads. (*Id.* ¶ 25.) Nevertheless, in the time leading up to the scheduled April 28, 2017 settlement conference, it became apparent that the Parties were too far apart to reach a resolution. So, at Plaintiff's request, Magistrate Judge Goodman agreed to cancel the in-person conference, and

11

required the Parties to participate instead in a telephonic settlement conference in April 2017. (Dkt. 65.) That call resulted in a further exchange of written offers between the Parties and a follow-up teleconference with Judge Goodman on May 5, 2017. (Dkt. 66.) At this point, the Parties were still far apart, but agreed to do an additional call with Judge Goodman on May 24. (Dkt. 67.) Through this call and another on July 6, 2017, Judge Goodman was able to get the Parties close enough that the in-person settlement conference on July 12, 2017 was ultimately successful. (Balabanian Decl. ¶ 26.) Nonetheless, the July 12th mediation still required significant effort. (*Id.* ¶ 27.) That is, the Parties participated in a full day of negotiations with Judge Goodman—one that went well beyond the normal court hours—and in the end, Judge Goodman still needed to bridge the final gap by making a mediator's proposal, which both Parties accepted. (*Id.*) This Court preliminarily approved the resulting Settlement on November 17, 2017. (Dkt. 84.)

E. **The *Wilens v. NRG Energy* Case in California.**

Unbeknownst to Class Counsel, attorneys Jeffrey Wilens and Jeffrey Spencer filed a similar TCPA case against NRG Energy and NRG Residential in Orange County, California, Superior Court on June 17, 2015. That case was subsequently removed to the Central District of California shortly after the instant matter was filed. (*See Wilens v. NRG Energy Inc. et al.*, No. 15-cv-01128, Dkt. 1. (C.D. Cal. 2015). The complaint listed attorney Wilens as the named-plaintiff and

listed Spencer—with whom Wilens has a long-time relationship—as his counsel. Presumably acknowledging that it was problematic to use another lawyer with whom proposed class counsel has a personal relationship as the class representative, Wilens and Spencer seemed intent on forcing NRG to identify the names of other Class Members who could substitute into the case in place of Wilens as the class representative. (*See Wilens,* No. 15-cv-01128, Dkt. 63.)

Focused on those efforts, Wilens and Spencer overlooked (or perhaps were too unfamiliar with the industry to understand), that NRG's discovery responses about the number of class members were plainly limited to leads it purchased from a single-lead generator—not the entirety of the class they purportedly sought to represent. (*See Wilens*, No. 15-cv-01128, Dkt. 1 at ¶ 6; *see also* Dkt. 91-5, 91-6.) Ultimately, Wilens and Spencer were able to successfully contact two individuals to take Wilens's place: Objector Gilbert Abarca and another individual Mara Allen.[4]

Other than their focus on getting class member contact information to contact a new representative, the only real litigation that occurred in their case was responding to motion for Rule 11 sanctions about their inclusion of NRG Energy in the case without basis, responding to a motion to compel disclosure of prior sanctions issued against Wilens and Spencer, motions to strike due to

---

[4]    Ms. Allen, still represented by Spencer, is one of the three individuals that requested to be excluded.

misrepresentations made in communications to absent class members, and motions claiming Spencer misrepresented to the Court why he wanted class member contact information. (*See Wilens*, No. 15-cv-01128, Dkts. 41, 76, 77, 88.)

Though the Rule 11 Motion was denied—because "[Wilens's] claims and evidence regarding NRG Energy [were] not so lacking as to merit sanctions[]" (*Id.* at Dkt. 52 at 6)—this was not an endorsement by the court that Wilens's claim that NRG Energy and NRG Residential were alter-egos was meritorious (as Objectors here seem to think). Rather, it was merely a recognition that the issue was more appropriate for summary judgment because NRG included affidavits prepared post-complaint demonstrating that Wilens's allegations were false.[5] (*Id.* at 4.)

## III.   TERMS OF THE SETTLEMENT

The terms of the Settlement, which the Court preliminarily approved on November 17, 2017, are fully set forth in the Settlement Agreement (Ex. 1) and are briefly summarized below.

**A.     Class Definition:** On November 17, 2017, the Court certified a Settlement Class of "all persons with respect to whom NRG Residential was offered a lead from a third-party lead generator as a result of the lead generator's

---

[5]      Even if supported by facts, Wilens' claim that NRG Residential was an "alter-ego" of NRG Energy or that he could successfully pierce the corporate veil is simply unrealistic in this Circuit. *See Zarichny v. Complete Payment Recovery Servs., Inc.*, 80 F. Supp. 3d 610, 618-19 (E.D. Pa. 2015).

telephone call to such person." (Dkt. 84 ¶ 4.) As noted above, the Parties indicated there were approximately 317,000 Class Members, based on NRG's records of leads purchased. (Dkts. 82, 87.) After splitting records with multiple unique persons and removing duplicate records, the final class list contained 284,904 persons. (*See* Dkt. 95, Christman Decl. at ¶ 4.)

**B.     Monetary Relief:** NRG Residential has agreed to create a non-reversionary $7 million Settlement Fund. (Ex. 1, Agreement § 1.30.) Each Settlement Class Member that submitted a valid claim prior to the February 20, 2018 Claims Deadline will receive a *pro rata* share of the Settlement Fund, after payment of all Settlement Administration Expenses, any incentive award to the Class Representative, any Fee Award to Class Counsel, and any applicable taxes. (*Id.* at § 2.1(b).) Assuming the Court grants Plaintiff's fee petition (Dkt. 87), each Class Members with valid claims will receive a cash payment of approximately $175. (Balabanian Decl. ¶ 30.)

**C.     Incentive Award and Attorneys' Fees:** In its preliminary approval order, the Court appointed Michael Dobkin as Class Representative and his counsel as Class Counsel. (Dkt. 84 ¶ 6.) The Settlement Agreement provides that any incentive award and attorneys' fees awarded to Dobkin by the Court will be paid from the Settlement Fund. (Ex. 1, Agreement §§ 9.1, 9.3.) Plaintiff has separately petitioned the Court for an incentive award of $5,000 and attorneys' fees

15

and expenses of $2,333,333, or one-third of the Settlement Fund. (Dkt. 87, Agreement § 9.1.) Plaintiff's fee petition was posted on the Settlement Website and is readily accessible for the Settlement Class to view. (Dkt. 95, Christman Decl. ¶ 9.)

**D. Payment of Notice and Administrative Expenses:** The costs of Settlement Administration Expenses are being paid from the Settlement Fund. (Ex. 1, Agreement § 1.26.) The total costs of notice and administration of the Settlement are expected to be approximately $220,000-$250,000.

**E. Release:** In exchange for the monetary relief described above, NRG Residential (along with NRG Energy, any lead generator that called a member of the Settlement Class, and the other "Released Parties" as defined in the Settlement Agreement) will be released, relinquished and forever discharged from any and all claims relating in any way to calls that the Released Parties may have made to members of the Settlement Class that violated the TCPA or state law. (Ex. 1, Agreement § 3.)

## IV. THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS AND THE NOTICE OBJECTIONS ARE MERITLES.

Prior to granting final approval to this Settlement, the Court must first consider whether the notice to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see*

*also Larson v. AT&T Mobility LLC*, 687 F.3d 109, 126 (3d Cir. 2012). The "best notice practicable" does not require receipt of actual notice by all class members in order to comport with both Rule 23 and the requirements of due process, but it often includes (as in this case) direct notice to individuals who can be identified by regular mail. *See Serio v. Wachovia Sec., LLC*, No. CIV.A. 06-cv-4681, 2009 WL 900167, at *8 (D.N.J. Mar. 31, 2009) ("[n]otice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members") (internal quotations and citations omitted).

## A. The Court-Approved Notice was Directly Provided to 95% of the Settlement Class.

The notice plan approved by the Court in this case has been implemented by the Court-approved Settlement Administrator, Kurtzman Carson Consultants LLC ("KCC"). Direct notice was provided to approximately 95% of the Settlement Class via electronic and regular mail, which was every Class Member who could be identified through reasonable effort. (Dkt. 95, Christman Decl. ¶¶ 6-7.) Specifically, KCC mailed 171,253 double-sided notice postcards and accompanying claim forms (with return postage pre-paid by postcard) to

Settlement Class Members. (*Id.* ¶ 6.)[6] In addition, KCC sent the court-approved notice via email to 113,651 available electronic mail addresses, of which, 74,476 were successfully delivered. (*Id.* ¶ 7.) For the emails that bounced back or were sent to invalid addresses, KCC mailed postcards to 38,995 of the 39,175 Settlement Class Members with invalid or bounced-back email addresses. (*Id.* ¶ 8.) Ultimately, notice was directly delivered to approximately 95% of the 284,904 names and addresses associated with the telephone numbers obtained from the Defendant's records (*Id.* ¶¶ 6-7), and was thus reasonable. *See* Federal Judicial Center, *Judges' Class Action Notice & Claims Process Checklist & Plain Language Guide* 3 (2010) (concluding that a notice plan that reaches at least 70% of the class is reasonable).

Finally, the required notice was sent to the Attorney General of the United States as well as the Attorneys General of all 50 states, the District of Columbia, Puerto Rico, Guam, the Northern Mariana Islands, the U.S. Virgin Islands, and American Samoa. (Dkt. 95, Christman Decl. ¶ 4.)

Each summary noticed provided to class members directed them to the Settlement Website—www.NRGResidentialSolarTCPASettlement.com—that provided the "long form" notice, important Court documents (including the

---

[6]     Of the 171,253 postcards mailed, 1,922 were returned by the U.S. Postal Service with forwarded addresses 1,489 were successfully remailed. 16,442 were returned undeliverable without forwarding addresses. (Dkt. 95, Christman Decl. ¶ 6.)

Settlement Agreement and Plaintiff's fee petition), answers to FAQs, and the ability to file claims on-line. (*Id.* ¶ 9.) Additionally, since the time that the Notice Plan was effectuated and until this day, the Settlement Administrator has maintained a toll-free number (1-866-652-8179) that provides general information about the Settlement, answers to frequently asked questions, and an option to request a hard copy of the notice documents and Claim Form. (*Id.* ¶ 10.)

Given that the Parties and KCC fully implemented the Court-approved Notice Plan and more than 95% of the Settlement Class received direct notice of the Settlement, it is clear that Rule 23's notice requirements and due process have been satisfied.

### B.  The Objections to Notice Are Meritless.

Objectors levy several criticisms of the Court-approved notice, including: (1) the notice Mr. Abarca received was a single page postcard missing entire sections describing the Settlement; (2) the notice was not sent to all Class Members, specifically Mr. Wilens; (3) the notice does not say who exactly is released; (4) the notice says Class Members "likely" received calls instead of "did" receive them; and (5) the notice does not say how much people are likely to recover. Each contention is meritless.

First, start with objector Abarca's assertion that he "only received a post card notice containing the claim form which did not include the third page of the

post card notice contained in Exhibit C to the Dobkin Settlement Agreement."
(Dkt. 91at 17.) This is a false statement. The court-approved summary notice was a
folding "double postcard," with printing on four separate panels separated by a
perforation. (Dkt. 95, Christman Decl. ¶ 25.) Mr. Abarca's Exhibit 6 (Dkt. 91-8)
shows only the front side of two of the panels (the panel with Mr. Abarca's address
and the claim form). But the reverse side of the panel with Mr. Abaraca's address
contains the summary of the Settlement. (Dkt. 95, Christman Decl. ¶ 25.) In fact,
you can actually faintly see the columned text printed on the reverse in the picture
Mr. Abarca took. (*Id.* ¶ 25; *see also* Dkt. 91-8.) Similarly, the reverse of the "claim
form" portion of the postcard is the return address of the Settlement Administrator,
so it can be filled out and mailed back. (Dkt. 95, Christman Decl. ¶ 25.)
Accordingly, this objection is frivolous and, likely made in bad faith.

Second, Objectors assert that the notice was not sent to all Class Members
as evidenced by Mr. Wilens's claim that he never received the notice—the
insinuation being that it was never sent to him. (Dkt. 89 at 41.) To be clear, it was.
(Dkt. 95, Christman Decl. ¶¶ 18-20.) KCC initially included Mr. Wilens on the list
of Class Members to receive an email, but KCC's email vendor rejected the email
address on file for Mr. Wilens as being invalid. (*Id.* ¶ 19.) Then, on January 8,
2018, KCC mailed Mr. Wilens a postcard notice to 17222 Blue Spruce Ln, Yorba
Linda, CA 92886-1864. (*Id.* ¶ 20.) A simple Internet search reveals that Jeffrey and

Theresa Wilens are the owners of the property at that address. *See* https://www.arivify.com/property/search/RAfqKnE19. And the postcard notice was not returned as undeliverable. (Dkt. 95, Christman Decl. ¶ 20.)

If Mr. Wilens is being truthful and missed the postcard arriving in the mail, it doesn't change the fact that KCC has verified that 95% of the Class received direct notice (*Id*. ¶¶ 6-7), making Objectors' speculation about inadequate notice reach simply not true. And if Objectors were correct, "whether [Wilens] received the actual postcard is immaterial as a matter of law to the issue of whether the [class] received proper and adequate notice." *Marin v. Comenity Bank, LLC*, No. 16-cv-0737, 2017 WL 3670030, at *3 (E.D.N.Y. July 11, 2017) (collecting authority). "As a matter of law, it is enough that the postcard notice was sent to the plaintiff's last known address." (*Id.*) Objectors also suggest that Class Members who did not receive direct notice not be bound by the release, but such a result is contrary to the purpose of Rule 23. *See* 7AA Wright et al., *Federal Practice & Procedure* § 1789.1, at 571 (3d ed. 2005) ("an absent class member will be bound by any judgment that is entered if appropriate notice is given, even though the absentee never actually received notice").

Finally, the Objectors make a series of claims of what the notice should have said (e.g. that the individual "did receive" instead of "likely received" a robocall) or what they believe is missing (the lead generators names and likely amount

recovered). Again, these claims are baseless. First, this Court has already determined the notice adequately apprised Class Members of the requisite information about the Settlement and their rights. (Dkt. 84 ¶ 2.) Second, the direct email and direct postcard notice each indicate that Class Members can visit the Settlement Website for further information about the case, who's included in the Settlement Class, and the scope of the release. (Ex. 1.) The Settlement Website further included numerous filings from this case, including the complete Settlement Agreement and preliminary approval and fee briefs (that contain the estimated payment amount they claim is missing). (Dkt. 95, Christman Decl. ¶ ¶ 9.) Ultimately, the notices contained all the required information and clearly contained enough to apprise Class Members of their rights and gain the approval of the Court. *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) ("The e-mail and mail notices, which did not need to and could not provide an exact forecast of how much each class member would receive, gave class members enough information so that those with 'adverse viewpoints' could investigate and 'come forward and be heard.'").

## V.  THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE AND WARRANTS FINAL APPROVAL.

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ.

P. 23(e). The Third Circuit has identified nine factors, known as the "*Girsh*

factors," that district courts should consider when making this determination.

These include:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining a class action; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*. 521 F.2d 153, 157 (3d Cir. 1975). "These factors are a guide and

the absence of one or more does not automatically render the settlement unfair.

Rather, the court must look at all the circumstances of the case and determine

whether the settlement is within the range of reasonableness under *Girsh*." *In re

American Family Enterprises*, 256 B.R. 377, 418 (D.N.J. 2000) (citation omitted).

When evaluating these factors, there is an "overriding public interest in

settling class action litigation." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d

516, 535 (3d Cir. 2004); *see also In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333,

351 (3d Cir. 2010). Settlement is particularly favored in class actions where

substantial judicial resources can be conserved by avoiding formal litigation. *In re

Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784

(3d Cir. 1995); *see also* Newberg & Conte, 2 NEWBERG ON CLASS ACTIONS,

§11.50 (4th ed. 2002) ("Unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results.").

### A.   The Settlement Is Presumably Fair.

When addressing the *Girsh* factors, a proposed settlement will be "entitled to a presumption of fairness" when "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected." *In re Warfarin*, 391 F.3d at 535 (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001)). Here, such a presumption is warranted.

First, this Court already recognized that the Settlement "has been negotiated at arm's-length between experienced attorneys familiar with the legal and factual issues of this case and was reached with the assistance of the Honorable Lois H. Goodman of this Court." (Dkt. 84 ¶ 1.) The considerable time and effort Judge Goodman expended to bring the Parties to resolution ensures negotiations were at arm's length and non-collusive. *See In re Ocean Power Techs., Inc.*, No. 3:14-cv-03799, 2016 WL 6778218, at *11 (D.N.J. Nov. 15, 2016) ("[T]he participation of an independent mediator in settlement negotiations virtually [e]nsures that the negotiations were conducted at arm's length and without collusion between the parties.") (internal quotation omitted). In addition, few firms have more consumer

class action experience than Class Counsel and even fewer (if any) have comparable TCPA class action experience, especially the breadth of considerable experience Class Counsel possesses with cases involving lead generation issues. (*See* Dkt. 87-2 at 14-20.) That experience, coupled with the discovery Class Counsel was able to obtain on the lead-generators and the number of leads NRG purchased gave them ample information to effectively evaluate the strength of the claims and negotiate the Settlement. Finally, of the approximate 300,000 Class Members, there are only two objections and as explained herein, they are coordinated and meritless. The *Girsh* factors should thus be evaluated with a presumption that the Settlement is fair.

**B.     The *Girsh* Factors All Favor Approval.**

Each of the *Girsh* factors also supports final approval of the Settlement.

> ### 1.     *The complexity, expense, and likely duration of continued litigation justify final approval of the Settlement.*

The first *Girsh* factor considers "the probable costs, in both time and money, of continued litigation." *In re Gen. Motors*, 55 F.3d at 812 (citing *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 801 (3d Cir. 1974)). "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." *Id.* at 812.

Here, proceeding through adversarial class certification, summary judgment,

eventual trial, and inevitable appeals will be a lengthy, complex, and expensive undertaking. In contrast, the Settlement avoids the length, expense, and complexities of continued litigation, which would only serve to delay ultimate relief to the Settlement Class Members. Although class certification in TCPA cases is not uncommon, *see e.g.*, *Ira Holtzman, CPA v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013) ("certification is normal in litigation under § 227"), there are instances when certification has been denied where, like NRG here, the defendant argues there exists evidence of individualized consent. (Dkt. 31at 7.) *See Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Pa.1995) (denying certification of TCPA claim based on "inherently individualized" question of consent). The party losing class certification would also assuredly seek review of that decision pursuant to Rule 23(f).

Even if a class were certified, however, the Parties were bound to litigate the costly and complex issue of Defendant's vicarious liability, as NRG Residential has steadfastly maintained that its lead generators are independent contractors. (*See* Dkt. 31 at 8, Dkts. 68 & 74.) And, as Class Counsel is uniquely aware, there is much uncertainty surrounding vicarious liability in the TCPA context, as courts across the country have come out both ways on the issue, *compare Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014–15 (9th Cir. 2018) (affirming summary judgment for defendant in lead generator TCPA case, finding no

26

vicarious liability); *with Aranda v. Caribbean Cruise Line, Inc.*, 179 F. Supp. 3d 817, 833 (N.D. Ill. 2016) (denying summary judgment for defendant in lead generation TCPA case but noting the difficulties plaintiffs faced at trial); and *Simmons v. Charter Communc, Inc*., 222 F. Supp. 3d 121 (D. Conn. 2016), aff'd, 686 F. App'x 48 (2d Cir. 2017) (finding defendant not vicariously liable in TCPA case). The Third Circuit has not yet weighed in on the issue and any ruling on vicarious liability is certainly to be appealed, further increasing the potential length and costs of this case.

For these reasons, the first *Girsh* factor strongly supports final approval.

### 2. *The reaction of the Settlement Class has been overwhelmingly favorable.*

The second *Girsh* factor—the reaction of class members—also strongly supports final approval of the Settlement. Here, of the 284,904 Class Members, only three (or 0.001% of the Settlement Class) have opted out of the Settlement and only two (or 0.0007% of the class) have expressed any dissatisfaction with it. The fact that there is very little opposition to the Settlement relative to the total number of Class Members "creates a strong presumption that this factor weighs in favor of the Settlement." *In re Cendant*, 264 F.3d at 234-35 (affirming district court's conclusion that the class' reaction was "extremely favorable" where 478,000 were notices sent, 234 class members opted out, and 4 objections were made); *In re Philips/Magnavox Television Litig.*, No. 09-cv-3072, 2012 WL

1677244, at *9 (D.N.J. May 14, 2012) (finding that "[t]he paucity of negative

feedback . . . overwhelmingly" supports settlement where only thirteen of the

291,000 class members opted out and six objected); *Stoetzner v. U.S. Steel Corp.*,

897 F.2d 115, 118-19 (3d Cir. 1990) (holding that "only" 29 objections in 281

member class "strongly favors settlement"); *Weiss v. Mercedes-Benz of N. Am.,

Inc.*, 899 F. Supp. 1297, 1301 (D.N.J. 1995) *aff'd*, 66 F.3d 314 (3d Cir. 1995)

(holding that "substantial silent consent weighs in favor of certification," where

approximately 100 out of 30,000 class members objected or opted out of the class).

On the other side of the ledger, Settlement Class Members have voiced their

satisfaction with the Settlement by submitting an above-average number of claims.

Indeed, of the 284,904 Class Members sent notice, 25,040 timely valid claims have

been filed, resulting in a claims rate of approximately 9%. This claim rate is far

higher than the typical TCPA class action settlement. *See, e.g., Wilkins v. HSBC

Bank Nevada, N.A.*, No. 14-cv-00190, 2015 WL 890566, at *3 (N.D. Ill. Feb. 27,

2015) (approving TCPA settlement with claims rate of 3.16%); *Kolinek v.

Walgreen Co.*, 311 F.R.D. 483, 495 (N.D. Ill. 2015) (approving TCPA settlement

with claims rate of 2.5%.); *Barani v. Wells Fargo Bank, N.A.*, No. 12-cv-02999,

Dkt. 32 at *5–6 (S.D. Cal. Mar. 6, 2015) (1.17% claims rate); *Couser v. Comenity

Bank*, 125 F. Supp. 3d 1034, 1044 (S.D. Cal. 2015) (approving TCPA settlement

with "a higher than average claims rate of 7.7%.").

In the end, the numbers speak for themselves and show a positive reaction from Settlement Class Members. Consequently, the second *Girsh* factor also weighs in favor of final approval. *See In re Cendant Corp. Litig.*, 264 F.3d at 234-35 (finding class reaction favored approval where "the number of objectors was quite small in light of the number of notices sent and claims filed").

### 3. Class Counsel had sufficient information at this stage in the litigation to evaluate the merits and reasonableness of the Settlement.

The third *Girsh* factor to be considered is "the stage of the proceedings and the amount of discovery completed." 521 F.2d at 156-57. This factor "captures the degree of case development that class counsel have accomplished prior to settlement" and takes into account both the type and amount of discovery completed. *In re Cendant*, 264 F.3d at 235. Through this inquiry, it can be determined whether "counsel had an adequate appreciation of the merits of the case before negotiation." *In re General Motors*, 55 F.3d at 813. That said, settlements are routinely approved in the "pre-trial stage" and even when "formal discovery had not yet commenced." *In re Ocean Power Techs., Inc.*, No. 2016 WL 6778218, at *17 (internal quotations omitted).

As detailed above, pleadings issues were resolved and a class certification motion was fully briefed (though deferred ruling and further briefing was requested). In addition, Class Counsel's discovery efforts wisely focused on

determining the lead generators involved in placing calls for NRG, the number of

calls made, the identities of the individuals who received the calls, and ultimately,

the number of leads purchased by NRG. (Ex. 2, Balabanian Decl. ¶¶ 8-17.) But

NRG did not just hand over this information when requested in discovery. Rather,

NRG maintained that it needed to only identify third-party lead generators that

placed calls to the named Plaintiff, regardless of whether the class was defined to

include all persons who received the telemarketing calls irrespective of which lead

generator placed the calls. (*Id.* ¶ 11.) So, Class Counsel was forced to file a Rule

37 motion to compel that information and submit follow up briefing at the Court's

request (*see* Dkts. 68 & 74), to issue subpoenas to each of NRG's known lead

generators and the telecommunications companies Plaintiffs believed they used to

effectuate the calls (totaling over seventy (70) in all), depose certain of those

entities (or the individuals that represented them), and to file miscellaneous actions

pursuant to Rule 45 in federal courts across the country to enforce them. Such

discovery efforts strongly demonstrate that this *Girsh* factor is satisfied. *See, e.g.*,

*Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 513

F. Supp. 2d 322, 331 (E.D. Pa. 2007) (finding this factor supports approval where,

*inter alia*, "[t]hird party discovery in this matter took more than one year due to

motions to compel . . . filed in several other district courts"). Notably, these efforts

also demonstrate yet another false statement made by the Objectors: that "Dobkin

never engaged in any motion to compel practice to compel discovery . . . ." (Dkt. 91 at 25.) The record evidences that this sentiment could not be farther from the truth.

Ultimately, through these efforts, Class Counsel obtained an abundance of information from NRG, its lead generators, and other third-party entities. They learned information about the lead-generators' calling practices, NRG's review of those practices, and ultimately the number of leads that NRG purchased. It was the collection of this information that allowed them to effectively evaluate the merits of this case and reach resolution with Judge Goodman.

Given Class Counsel's extensive development of the case prior to the settlement negotiations, the third *Girsh* factor strongly weighs in favor of final approval as well.

### 4.    *Establishing liability and damages would be risky.*

The fourth and fifth *Girsh* factors examine Plaintiff's ability to establish liability and damages and are commonly discussed together. These factors require the district court to inquire as to "what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re Gen. Motors*, 55 F.3d at 814. The fourth factor specifically requires a "balancing of the likelihood of success if 'the case were taken to trial

against the benefits of immediate settlement,'" *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 89 (D.N.J. 2001) (quoting *In re Prudential Ins. Co. Am. Sales Practices Litig.*, 148 F.3d 283, 319 (3d Cir. 1998)), while the fifth factor assesses the "expected value of litigating the action rather than settling it at the current time." *Id.* These factors support final approval "[w]here there is a prospect of long, contentious, and uncertain litigation." *Castro v. Sanofi Pasteur Inc.*, No. 11-cv-007178, 2017 WL 4776626, at *4 (D.N.J. Oct. 23, 2017).

As noted above, absent settlement, the primary focus of this case moving forward would be the issue of NRG's vicarious liability. Because NRG did not place the calls itself, Dobkin would have to demonstrate vicariously liability for the lead generators' calls under federal common law agency principals. *See, e.g.*, *City Select Auto Sales, Inc. v. David Randall Associates, Inc.*, No. 11-cv-02658, 2014 WL 4755487, at *6 (D.N.J. Sept. 24, 2014); *see also Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6583-84, 6587, n. 107 (2013). While Dobkin believes he could establish NRG's liability on a theory that it ratified the lead-generators allegedly illegal calls, but that result is far from certain. Indeed, several courts have entered summary judgment for defendants on vicarious liability grounds. *See Henderson v. United Student Aid Funds, Inc.*, No. 13-cv-1845 JLS (BLM), 2017 WL 766548, at *8 (S.D. Cal. Feb. 28, 2017) (granting summary judgment to defendant in TCPA case on vicarious liability); *Kristensen*, 879 F.3d

32

at 1014–15 (affirming summary judgment in favor of defendants on issues of ratification in TCPA class action); *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679–80 (9th Cir. 2014) (affirming grant of summary judgment to defendant finding no vicarious liability in TCPA class action).

Even assuming this case were to proceed to trial and the jury entered a verdict for Dobkin, the judgment stands a significant chance of being reduced.[7] Complete relief to the class for a single violation—not even accounting for the imposition of treble damages if the violations are deemed willful—would amount to $142,453,500. Defendant would most certainly challenge such a verdict on due process grounds (Dkt. 31 at 8), making remittitur a distinct possibility. *See, e.g.*, *Dennis v. Trans Union, LLC*, No. 14-cv-02865, 2014 WL 5325231, at *8 n.7 (E.D. Pa. Oct. 20, 2014) (noting, but not deciding, a due process challenge to statutory damages which could result in, according to the defendant, "crushing liability"); *Golan v. Veritas Entm't, LLC*, No. 14-cv-000069, 2017 WL3923162, *4 (E.D. Mo. Sept. 7, 2017) (reducing $1.6 billion TCPA damage award to $32 million, amount to $10 per violative call).

By contrast, the Settlement before the Court provides Class Members immediate cash payments—estimated to be approximately $175 per Class

---

[7]     This also presumes that NRG Residential wouldn't seek bankruptcy protection as a result of a class verdict in Plaintiff's favor, which is the likely outcome as discussed below.

Member—without the uncertainty and expense of contentious and protracted litigation. This relief, as discussed herein, is well within the range of other TCPA class action settlement. In light of these risks to Plaintiff's ability to sufficiently establish liability and damages should litigation continue, the fourth and fifth *Girsh* factors weigh in favor of final settlement approval. *See Melito v. Am. Eagle Outfitters, Inc.*, No. 14-cv-2440, 2017 WL 3995619, at *14 (S.D.N.Y. Sept. 11, 2017) ("Here, although the Class Members receive less than the maximum value of their TCPA claims, they receive a payout without having suffered anything beyond a few unwanted calls or texts, they receive it (reasonably) quickly, and they receive it without the time, expense, and uncertainty of litigation.") (internal quotation omitted).

### 5.   *Maintaining class action status through trial would not be certain.*

The next *Girsh* factor examines the risk of maintaining class action status through trial. "[T]he prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action." *In re Warfarin*, 391 F.3d at 537 (quoting *In re Gen. Motors*, 55 F.3d at 817). Further, "[t]he value of a class action depends largely on the certification of the class because, not only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits." *In re Gen. Motors*, 55 F.3d at 817. Thus, this

34

*Girsh* "factor measures the likelihood of obtaining and keeping a class certified if the action were to proceed to trial." *Id.* (citing *In re Prudential*, 148 F.3d at 321).

Here, while Plaintiff and Class Counsel have always been confident in their ability to obtain certification, and class certification in TCPA litigation is routine, settlement risk nonetheless remained. First, although the Court certified the Settlement Class for settlement purposes (Dkt. 84 at 4), there is no guarantee that the Settlement Class would remain certified were litigation to continue, and the Court is in no way bound by its current certification order. *See* Fed. R. Civ. P. 23(c)(1)(C); (Ex. 1, Agreement § 10.3). *See In re Prudential Ins. Co. of Am. Sales Pracs. Litig.*, 962 F. Supp. 450, 540 (D.N.J. 1997) ("[A]lthough the Court finds that this case is manageable as a class action and that the class action device is the most appropriate means to adjudicate this controversy, as the case evolves, maintaining the class action may become unworkable and the Court may decertify the class. Accordingly, the risks of decertification weigh in favor of approving the Proposed Settlement."). In addition, Defendant has steadfastly disputed that class treatment is appropriate here—particularly that variations in their relationships with the lead generators, as well as how those lead generators operated in terms of effectuating the calls—and would vigorously contest class certification if litigation were to continue. And, while somewhat predictable, Defendant also took the position that certification is inappropriate because consent was an inherently

35

individualized issue in the case. Predictable or not, individualized issues of consent are the one area in TCPA litigation where class certification has been denied. *See Forman*, 164 F.R.D. at 404; *see also Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106 (N.D. Ill. 2013) ("There is a split of opinion in TCPA cases on whether issues of individualized consent predominate over common questions of law or fact so as to prevent class certification.").

Consequently, the risk to maintaining class status through trial weighs in favor of granting final approval to the Settlement.

### 6. *Defendant has represented it cannot withstand a significantly greater judgment.*

The next *Girsh* factor looks to "whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement." *In re Cendant*, 264 F.3d at 240. In fact, Objectors here contend that the Settlement is "grossly inadequate given the statutory minimum" (Dkt. 89 at 28), which they claim approaches half-a-billion dollars. (Dkt. 91 at 25.) But Objectors' belief that NRG would pay the "statutory minimum" blinks reality as few companies could withstand a $142 million judgment, let alone a judgment three times that or higher. *See Wright v. Nationstar Mortgage LLC*, No. 14-cv-10457, 2016 WL 4505169, at *8 (N.D. Ill. Aug. 29, 2016) (rejecting identical objection as "complete victory for Plaintiffs at $500 or $1,500 per class member, multiplied by the number of calls each class member received, could bankrupt Nationstar and would be near

impossible for the Plaintiffs to collect and for Nationstar to pay") (internal quotation omitted).

Clearly, a verdict like that in favor of Plaintiff would severely impact Defendant financially and likely drive the company into bankruptcy. Indeed, NRG Residential is no longer operating a business pursuant to which it purchases leads from a third-party lead generator as a result of that lead generator's telephone calls to such persons. *See In re Cendant*, 264 F.3d at 241 (recognizing that "the possibility of bankruptcy is quite real when the settlement or judgment numbers sufficiently increase"); *In re AT&T Corp. Sec. Litig.*, No. 00-cv-5364, 2005 WL 6716404, at *5 (D.N.J. Apr. 25, 2005) (finding this factor weighs in favor of approval where "there is no guarantee that [defendant] would be able to withstand a multi-million or billion dollar judgment."). It's far better for the Class to receive the money earmarked for them on account of the Settlement than it would some uncollectable judgment months or perhaps still years from now. *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 228 (N.D. Ill. 2016) ("A $52.50 recovery in the hand is better than a $500 or $1,500 recovery that must be chased through the bankruptcy courts."); *see also Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*, No. 08-cv-03610 CLW, 2015 WL 2383358, at *6 (D.N.J. May 18, 2015), *aff'd*, 639 F. App'x 880 (3d Cir. 2016) (accepting representation that defendant lacked the ability to withstand a greater judgment "in light of the fact that the Settlement

Agreement is the product of extensive negotiations and is presented subsequent to protracted litigation").

> **7.    *The settlement amount is within the range of reasonableness in light of the recovery and attendant risks of litigation.***

The final two *Girsh* factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *In re Warfarin*, 391 F.3d at 538 (citing *In re Prudential*, 148 F.3d at 322). In conducting this evaluation, courts must recognize "that settlement represents a compromise in which the highest hopes for recovery are yielded in exchange for certainty and resolution." *Id.*

Here, the monetary relief provided by the Settlement is well within the range of relief provided to consumers under analogous TCPA settlements. Under the Settlement, every Settlement Class Member who submitted a valid claim will receive a cash payment of $175. *See, e.g., In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 786 (N.D. Ill. 2015) (providing $34.60 to each claiming class member); *Hashw v. Dept. Stores Nat'l Bank*, 182 F. Supp. 3d 935, 947 (D. Minn. 2016) (approving settlement providing claiming class members in TCPA case a $33.20 payment); *Kolinek*, 311 F.R.D. at 493 (providing a roughly $30 payment for each claiming class member); *Kazemi v. Payless Shoesource, Inc.*, No. 09-cv-05142, Dkt. 94 (N.D. Cal. Apr. 2, 2012) (granting approval of a settlement that provided a $25 voucher to each claiming class member); *Arthur v.*

*Sallie Mae, Inc.*, No. 10-cv-00198, Dkt. 266 (W.D. Wash. Sept. 17, 2012) (granting approval of a settlement that provided $20-40 cash payment to each claiming class member).

While the Settlement, of course, does not provide full relief to each Class Member, it is well-settled that "full compensation is not a prerequisite for a fair settlement," nor is it realistic. *Careccio v. BMW of N. Am. LLC*, No. 08-cv-02619, 2010 WL 1752347, at *6 (D.N.J. Apr. 29, 2010); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. at 790 (finding—in a TCPA case—that "a settlement is a compromise, and courts need not—and indeed should not—reject a settlement solely because it does not provide a complete victory to plaintiffs . . . especially . . . when complete victory would most surely bankrupt the prospective judgment debtor.")(internal quotation omitted).

Objector Abarca briefly notes that the relief is inadequate because the TCPA provides for damages on a per call basis and therefore his half-a-billion-dollar damage estimate should be even higher. (Dkt. 91at 25.) But multi-call TCPA class actions are routinely settled on the basis of a single payment per class member as often "a call-based claims process is inadvisable, particularly because the increased administration costs would result in a corresponding decrease in the money available to the class." *See Wilkins*, 2015 WL 890566 at *8 (overruling identical objection); *Gehrich*, 316 F.R.D. at 231 (overruling identical objection).

Therefore, because Plaintiff could not realistically achieve the "best possible recovery" for the Class—or anything close to it—the Settlement amount of $175 per Settlement Class Member falls well within the required range of reasonableness. Further, the Settlement is even more reasonable when considering the looming risks of litigating the case through trial, which could leave the Class empty handed. The Settlement, on the other hand, alleviates all risk and provides Settlement Class Members immediate—and significant—monetary relief. *See In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 101-02 (E.D. Pa. 2013) ("Under the settlement, each class member can benefit from the fund immediately and avoid the uncertainties and delay inherent in continuing to litigate this complex class action."). Thus, the final two *Girsh* factors likewise weigh in favor of final approval.[8]

## V.  THE COURT SHOULD OVERRULE THE WILENS AND ABARCA OBJECTIONS

Wilens and Abarca make a series of mostly overlapping objections, several of which have been shown above to be either wholly frivolous or completely

---

[8]    In addition to the nine *Girsh* factors, courts may also consider a list of "permissive and non-exhaustive" factors originally established in *In re Prudential* that "illustrat[e] the additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms." *In re Baby Prod.. Antitrust Litig.*, 708 F.3d 163, 174 (3d Cir. 2013) (internal quotation omitted). The Court need not analyze *Prudential* factors already discussed or not relevant to the Settlement. *See Skeen v. BMW of N. Am., LLC*, No.13-cv-01531, 2016 WL 4033969, at *17 (D.N.J. July 26, 2016). Here, all relevant factors are subsumed in the discussion of the *Girsh* factors above, or in response to the remaining objections below.

meritless. Their remaining objections regarding apparent conflicts amongst Class

Members, collusion with Defense Counsel, the scope of the release, the use of

claim forms, and the amount requested in attorneys' fees are equally baseless. For

the reasons that follow, the objections should be overruled in their entirety.

### A.   The Class Has No Conflicts and the Settlement Was Not Collusive.

Several of the Objectors' issues (the Class is not "cohesive," there is an

intra-class conflict, and the Settlement was the product of a "reverse auction") all

stem from the same flawed premise: that the 20,574 Class Members they trumpet

as having a "solid claim" are somehow different than the 284,904 members of the

Settlement Class. But each of the 284,904 members of the Settlement Class has an

identical and equally strong claim as the 20,574 Class Members whose information

was provided to NRG by Sunlight Solar Leads, it's just that their information came

from the other leads generators that NRG was using to place the allegedly illegal

calls.

Class Counsel, who have litigated several similar "lead generation" class

actions, recognized early on that NRG was utilizing several lead generators to

place the alleged unauthorized calls and sought to compel disclosure of each of

them. (*See* Dkts. 68 & 74, Rule 37 Ltrs.) They also pursued various miscellaneous

actions across the country, issued numerous subpoenas, and deposed key

representatives of certain entities, to obtain the information necessary to successfully pursue the Class's claims.

Wilens and Spencer, on the other hand, clearly misunderstood that the calling campaign utilized multiple lead generators, which equated to their failure to recognize that the discovery they received was not the entire universe of consumers that received calls in violation of the TCPA for NRG's benefit. A simple review of the interrogatory responses that Objectors use to tout their diligence demonstrates this. (Dkt. 91-5.) In fact, NRG's responses and supplemental responses to interrogatory 5 make clear that its answers identifying Sunlight Solar Leads are limited to the lead generator that "placed a phone call to Plaintiff's cellular telephone on or about June 11, 2015." (Dkt. 91-6.) Of course, NRG initially provided the same limited discovery responses to Class Counsel. (Ex. 2, Balabanian Decl. ¶ 11.) Ironically, therefore, it is Objectors inability to obtain the necessary discovery and their lack of awareness about the telemarketing lead generation industry that accounts for their mistaken belief that only 20,574 Class Members have "solid claims" and that the Class is not cohesive.

Relatedly, the objection that the instant Settlement is the result of a "reverse auction" is particularly risible. Here, NRG wisely chose to settle with the lawyers that have significant TCPA class action experience with the better and larger case over a pair of lawyers whose only apparent experience with TCPA class actions is

a case where, like here, Wilens was the class representative. *See Wilens v. Heart Savers, LLC*, 15-cv-01139, Dkt. 33 (C.D. Cal.). Moreover, Objectors' bald assertions that the Settlement is collusive and made in bad faith approaches an attack on the integrity of this Court. That is, Judge Goodman was extensively involved in brokering this Settlement and her presence ensures that the process was not collusive and that the deal would be beneficial to the Settlement Class. *See In re Ocean Power Techs., Inc.*, 2016 WL 6778218, at *11.

### B. The Release of Claims is Appropriate.

The Objectors assert without citation that the release of claims in the Settlement impermissibly includes the lead generators and could also be read to bar hypothetical claims for fraudulent misrepresentations or injuries caused from defective solar panel installations. Each assertion is baseless. First, "courts have consistently held that so long as the total compensation paid to the plaintiff class is fair, it does not matter that even *noncontributing* parties are released by a settlement." *In re Am. Family Enterprises*, 256 B.R. at 428 (collecting cases). As explained, the relief afforded the Settlement Class is well within the range of other similar TCPA litigation.

Second, a plain reading of the term "Released Claims" shows that the only claims being settled are those that relate "to calls made by" NRG and its agents to the Settlement Class in violation of the TCPA and related telemarketing laws. No

plausible construction of "Released Claims" would extend to injuries caused by subsequently purchased defective solar panels. There is also zero evidence that any actual fraudulent misrepresentations were made during the initial prerecorded calls that were the subject of this lawsuit. Dobkin does not have "an affirmative duty to rebut every allegation an objector makes [and] in the absence of any admissible evidence that the purported claims even exist . . . [and] the release of these claims i[s] not a sufficient reason to deny approval of the settlement." *Kaufman v. Am. Express Travel Related Serv. Co., Inc.*, 877 F.3d 276, 287 (7th Cir. 2017). Finally, even if "Released Claims" could be construed as Objectors say, "[a] federal court may release not only those claims alleged in the complaint but also a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might have not been presentable in the class action." *Gehrich*, 316 F.R.D. at 231 (quoting *Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273–74 (7th Cir.1998)); s*ee also Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1564 (3d Cir. 1994) (same). The objections to the scope of the release are therefore meritless and should be overruled.

### C.   The Claim Form was Necessary and Proper.

Objectors next argue that a claim form is not required in this case and that the court-approved claim form here improperly requires certification under penalty

of perjury and otherwise discourages claims by requiring Class Members to provide their information on the return postcard that is visible to others. Each objection misses the mark.

First, as even Wilens is forced to recognize in his objection (Dkt. 89 at18), "Courts have frequently upheld claims forms such as the one utilized in this case, and . . .  it is perfectly appropriate to require Class members to submit certain information proving that they are entitled to collect the relief awarded in this case." *Milliron v. T-Mobile USA, Inc.*, No. 08-cv-04149, 2009 WL 3345762, at *6 (D.N.J. Sept. 10, 2009), *aff'd*, 423 F. App'x 131 (3d Cir. 2011). Use of a claim form was particularly appropriate here because, as indicted above, NRG has maintained throughout this litigation that its lead-generators obtained Class Members' consent to robocall them. (Dkt. 31 at 7.) As a disputed element of class members' claims, it is entirely reasonable to require class members to affirm they never consented to get the robocalls at issue. *Kolinek*, 311 F.R.D. at 499 (overruling objection to claim form where claimants confirm they "received prerecorded . . . calls without their prior express consent . . . . [as] [i]t is neither unfair nor unreasonable to ask claimants to submit these claim forms in order to recover under the settlement"). And while the issue of consent can occasionally create individualized issues, use of a claim form cures any problems. *See In re Apple iPhone 4 Prod. Liab. Litig.*, No. 10-md-02188, 2012 WL 3283432, at *3 (N.D. Cal. Aug. 10, 2012) ("[A]s

45

[Defendant] has agreed to provide relief to any putative class member who files a claim form, no such [individual] inquiry is required.").

Essentially accepting the necessity of a claim form, Objectors also contend that if the claim form is necessary, then the information Class Members were required to provide and affirm was accurate was designed to discourage claims. Not so. "First, because the parties seek approval of a nonreversionary settlement fund—[NRG]'s total payment to the settlement fund will be $[7] million regardless of the number of claims filed—the contention the parties designed the claims process to discourage class members from making claims is a hard one to sell." *Kolinek*, 311 F.R.D. at 499. Nor is the requirement that Class Members affirm the information on the claim form is correct any cause for concern. *See, e.g., In re WorldCom, Inc. Sec. Litig.,* No. 02-cv-03288, 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (requirement that claim form be signed under penalty of perjury was "important in helping to insure that the settlement fund is distributed to class members who deserve to recover from the fund"); *Mangone v. First USA Bank,* 206 F.R.D. 222, 235 (S.D.Ill.2001) ("The requirement of an affirmation on the claim form, under penalty of perjury, from the Settlement Class Member seeking reimbursement . . . was appropriate and not objectionable."). Finally, if any Class Member was concerned about placing their phone number on the post card claim form where it is visible (Dkt. 91 at 16), they were free to file a claim

form on-line where no one (members of the U.S. Post office or others) will see it or even place it in an envelope at only a nominal additional cost.

As such, the objections to the claim form should be overruled.

**D.    Time Sheets are Not Required for a Lodestar Crosscheck.**

Finally, both Objectors claim that Class Counsel's request for fees is excessive and are required to submit their detailed time sheets before the Court can consider their request. Objectors are mistaken.

For one, both Objectors neglect to address that the percentage of the fund method is the primary method for determining the reasonableness of fees in common fund cases in this Circuit and was the basis upon which fees were sought. *See In re Prudential*, at 333-334. Moreover, they wrongly speculate that because they spent less time on their case, a detailed review of Class Counsel's time sheets will show "overbilling" for purposes of the lodestar cross-check. But it is well established that a lodestar cross-check "need not entail" a "full-blown lodestar inquiry," "mathematical precision," or review of actual time sheets. *In re AT&T Corp.,* 455 F.3d at 169 n.6 (quoting Report of the Third Circuit Task Force, Selection of Class Counsel, 208 F.R.D. 340, 423 (2002)). In accordance with L. Civ. R. 54.2, Class Counsel submitted a declaration detailing the experience, hours worked, and billing rates of each attorney performing work in this case. (Dkt. 87-2 at 9.) If the Court would like to review Class Counsel's time sheets to perform the

47

lodestar crosscheck, Class Counsel are happy to provide them for *in camera* review. But the Objectors aren't entitled to them—as if their opinion on how much time Class Counsel spent on this or that is relevant. It's not, and the overall objections to Class Counsel's requested fees are baseless and should be overruled as well.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff Michael Dobkin respectfully requests that the Court enter an Order: (a) granting final approval of the Settlement Agreement; (b) overruling the objections; (c) dismissing all Released Claims with prejudice; and (d) granting such other and further relief as the Court deems reasonable and just.

Respectfully submitted,

**MICHAEL DOBKIN**, individually, and on behalf of a class of similarly situated individuals,

Dated: April 24, 2018

By: /s/ Stefan L. Coleman
    One of Plaintiff's Attorneys

Rafey S. Balabanian (admitted *pro hac vice*)
rbalabanian@edelson.com
Eve-Lynn Rapp (admitted *pro hac vice*)
erapp@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Stefan L. Coleman
(NJ Attorney No. 000382009)
law@stefancoleman.com
LAW OFFICES OF STEFAN COLEMAN, LLC
1071 Madison Ave., Suite 1
Lakewood, New Jersey 08701
Tel: 877.333.9427
Fax: 888.498.8946

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2018, I caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/ Stefan L. Coleman</u>